HONS. NICOLÁS NOGUERAS, HIJO, y ROLANDO A. SILVA, en su carácter de miembros del SENADO DE PUERTO RICO, apelados, *v.* HON. RAFAEL HERNÁNDEZ COLÓN, GOBERNADOR DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO, apelante.

*Número:* AC-90-421 *Resuelto:* 16 de enero de 1991

---

*Jorge E. Pérez Díaz*, Procurador General, *Norma Cotti Cruz*, Subprocuradora General, y *Anabelle Rodríguez*, Procuradora General Auxiliar, abogados del Gobernador del Estado Libre Asociado de Puerto Rico, apelante; *Nicolás Nogueras, Hijo*, pro se.

PER CURIAM: El pasado 10 de mayo de 1989 los Senadores Nicolás Nogueras y Rolando Silva instaron en el Tribunal Superior, Sala de San Juan, un recurso de *mandamus* contra el Gobernador de Puerto Rico, Hon. Rafael Hernández Colón. En dicho recurso se solicitó al tribunal de instancia que le ordenara al Gobernador de Puerto Rico el envío al Senado de Puerto Rico de los nombramientos judiciales necesarios para cubrir aquellos puestos ocupados por jueces con nombramientos vencidos pero que continuaban ocupando los mismos en virtud de la cláusula de continuidad (*holding over*) contenida en la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico (Ley de la Judicatura), Ley Núm. 11 de 24 de julio de 1952 (4 L.P.R.A. secs. 92 y 152(c)), y la Ley sobre Jueces Municipales, Ley Núm. 7 de 8 de agosto de 1974 (4 L.P.R.A. sec. 211). Los Senadores apelados fundaron su reclamo en lo resuelto por este Tribunal en *Hernández Agosto v. López Nieves*, 114 D.P.R. 601 (1983), y en lo dispuesto en el Art. IV, Secs. 4 y 8 de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1. En esencia, argumentaron que mantener en estado de continuidad (*holding over*) a jueces cuyos nombramientos habían vencido usurpaba la facultad constitucional del Senado de aconsejar y consentir a tales nombramientos, violentando así la doctrina de separación de poderes.

La petición presentada por los Senadores Nogueras y Silva fue oportunamente contestada. El Gobernador, por conducto del Procurador General, arguyó en esencia: (1) que no procedía la expedición del auto de *mandamus* por cuanto su facultad de expedir nombramientos judiciales era eminentemente discrecio-

nal, no sujeta a revisión judicial; (2) que el asunto planteado en el recurso de *mandamus* constituía una cuestión política no justiciable; (3) que la constitucionalidad de la cláusula de continuidad que cobija a los jueces ha sido sostenida por este Tribunal, y (4) que la ausencia de los jueces afectados del pleito presentaba un problema de ausencia de parte indispensable.

Luego de someter memorando de derecho en apoyo de sus posiciones y de varios incidentes procesales, el caso quedó sometido ante el Tribunal Superior, Sala de San Juan (Hon. Gilberto Gierbolini, Juez), para su adjudicación. El 2 de mayo de 1990 el tribunal de instancia emitió su sentencia. En la misma, rechazó los argumentos del Gobernador y concluyó:

> Considerando todo lo anteriormente expresado en esta Opinión llegamos a la conclusión de que la tardanza del Gobernador para enviar nombramientos de jueces cuyos términos han expirado, es una práctica inconstitucional que priva al Senado de Puerto Rico de su poder constitucional de consejo y consentimiento; viola la dignidad de los jueces en suspenso; atenta contra el esquema de separación de poderes y afecta adversamente la independencia judicial. Debido a ello tal práctica no puede continuar en vigencia. Escrito de apelación, Apéndice, pág. 35.

En consecuencia, el tribunal de instancia le concedió al Gobernador ciento veinte (120) días para que "envi[ara] al Senado para su consejo y consentimiento . . . nombramientos, bien sean los actuales incumbentes o sus sustitutos, para cubrir los cargos de jueces cuyos términos han expirado". Escrito de apelación, Apéndice, pág. 36. En su sentencia, el tribunal *a quo no resolvió el efecto que tendría sobre los jueces incumbentes bajo la cláusula de continuidad la omisión del Gobernador de actuar sobre tales nombramientos en el mencionado plazo.*

Después de presentada esta apelación, la Asamblea Legislativa aprobó, y el Gobernador refrendó, la Ley Núm. 17 de 21 de julio de 1990 (Ley Núm. 17), con vigencia a partir de 19 de octubre de 1990. Esta ley tuvo el efecto de eliminar las cláusulas de continuidad (*holding over*) contenidas en la Ley de la Judicatura

y en la Ley sobre Jueces Municipales.(1) En su lugar, se estableció que el juez "cesará en sus funciones a los noventa (90) días de vencerse [su] término si no ha sido renominado o cuando su sucesor tome posesión de su cargo, lo que ocurra primero". 1990 Leyes de Puerto Rico 84. Dicho término de noventa (90) días expira para los primeros jueces afectados el 17 del corriente mes de enero.

En vista de la aprobación de dicho estatuto, el 3 de agosto de 1990 concedimos un término a las partes para que comparecieran a expresarse sobre la posible academicidad de este recurso. Contamos con el beneficio de esas comparecencias. En su escrito, el Procurador General discute extensamente la doctrina de academicidad y sostiene que con la aprobación de la Ley Núm. 17, *supra*, la apelación es académica. Aduce que esta ley es constitucionalmente válida en su aplicación retroactiva y en cuanto limita la cláusula de continuidad a un máximo de noventa (90) días. Argumenta que dicha cláusula no goza de rango constitucional.

Por su parte, los Senadores apelados exponen que la "controversia entre los senadores comparecientes y el Primer Ejecutivo no es colusoria ni ficticia. Persistirá mientras el ejercicio del poder constitucional de consejo y consentimiento de los senadores comparecientes esté a merced del capricho del Señor Gobernador para escoger el momento que a él le parezca oportuno para enviar nombramientos". Moción en cumplimiento de orden, pág. 5. Añaden que la "enmienda aprobada mediante la Ley Núm. 17 no aborda la práctica del Gobernador condenada en la Sentencia apelada ni le ordena enviar los nombramientos judiciales dentro de determinado período". Íd., pág. 7.

Por entender que la presente apelación plantea una cuestión constitucional sustancial y que —por las razones que más adelante se expresan— la misma no se ha tornado académica, damos

---

(1) Continúan vigentes, sin embargo, las cláusulas de continuidad que cobijan la incumbencia de otros funcionarios públicos de la Rama Ejecutiva cuyos puestos no han sido creados por la Constitución, tales como Fiscales, Registradores de la Propiedad, etcétera.

curso a ella, y por la importancia de la controversia jurídica involucrada pasamos de inmediato a resolverla.

## I

■ Una vez más nos confrontamos con un caso que plantea una controversia relacionada con la función del Senado de impartir el consejo y consentimiento de la nominación de varios funcionarios, en este caso los jueces. En *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407, 415 (1982), reconocimos que un miembro del Senado tiene un interés legítimo en participar en el proceso constitucional de impartir consejo y consentimiento a la nominación de funcionarios. Art. IV, Sec. 5 de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1. De tener el Gobernador el deber de enviar al Senado la nominación de los jueces cuyos términos han vencido o de sus sucesores, la omisión de así hacerlo ciertamente menoscabaría las funciones constitucionales de los senadores recurrentes.

[2] De existir, pues, este deber, el interés de los Senadores en la causa de acción ejercitada resulta evidente y cumple cabalmente con la doctrina de capacidad jurídica. Al igual que en el caso de *Hernández Agosto v. Romero Barceló*, supra, pág. 412, "es el Gobernador quien alegadamente tiene que cumplir con el deber de enviar las nominaciones de los funcionarios concernidos al Senado, por lo que es él la única parte indispensable en este recurso. Los funcionarios en cuestión no tienen obligación alguna con respecto al cumplimiento de este deber objeto del litigio". Por lo tanto, los jueces incumbentes cuyos términos están vencidos no son partes indispensables.

## II

Pasemos ahora a considerar la procedencia o no del auto de *mandamus* presentado.

El planteamiento principal de los Senadores recurridos se funda en que mantener a los jueces cuyos nombramientos han

vencido en estado de continuidad tiene el efecto de impedir la intervención del Senado en el proceso de confirmación y menoscaba, por lo tanto, las funciones constitucionales de los Senadores recurrentes. Alegan, además, que el Gobernador "tiene la obligación legal de enviar para su confirmación por el Senado de Puerto Rico los nombramientos de los jueces con sus términos vencidos ('holding-over') o los nombramientos de sus sustitutos. Esa obligación legal [de acuerdo con los recurridos] emana de la Sección 4 del Artículo IV y de la Sección 8 del Artículo V de la Constitución de Puerto Rico y de lo resuelto por el Tribunal Supremo de Puerto Rico en *Hernández Agosto v. López Nieves*, 114 D.P.R. 601 (1983)". Escrito de apelación, Apéndice, pág. 43.

La situación en el caso de autos requiere que determinemos qué efectos, si alguno, tuvo sobre la cuestión planteada la aprobación de la Ley Núm. 17, *supra*. Si llegáramos a la conclusión de que aún está vigente la cláusula de continuidad para los jueces nombrados al amparo de la Ley de la Judicatura y de la Ley sobre Jueces Municipales, debemos entonces determinar cuál es el término máximo razonable de duración de dicha continuidad.

El Art. V, Sec. 8 de nuestra Constitución, L.P.R.A., Tomo 1, ed. 1982, pág. 360, dispone:

> Los jueces serán nombrados por el Gobernador con el consejo y consentimiento del Senado. Los jueces del Tribunal Supremo no tomarán posesión de sus cargos hasta que sus nombramientos sean confirmados por el Senado y los desempeñarán mientras observen buena conducta. *Los términos de los cargos de los demás jueces se fijarán por ley* y no podrán ser de menor duración que la prescrita para los cargos de jueces de igual o equivalente categoría existentes en la fecha en que comience a regir esta Constitución. Todo lo relativo al nombramiento de los demás funcionarios y de los empleados de los tribunales, se determinará por ley. (Énfasis suplido.)

■ En cumplimiento del mandato contenido en dicha sección, la Asamblea Legislativa ha fijado los términos correspondientes a las distintas categorías de los jueces del Tribunal de Primera Instancia. Tanto en las Secs. 12 y 17(c) de la Ley de la Judicatura,

4 L.P.R.A. secs. 92 y 17(c), como en el Art. 1 de la Ley sobre Jueces Municipales, 4 L.P.R.A. sec. 211, se dispone en cuanto a todos los jueces de dicho tribunal que desempeñarán sus puestos por el término para el cual fueron nombrados *y hasta que "su sucesor tome posesión de su cargo . . .".* (Énfasis suplido.)

En su contestación a la demanda presentada en su contra, *el Gobernador reconoció que tales cláusulas de continuidad* establecidas en la ley para los miembros de la Judicatura *"son parte del término de su nombramiento al cargo judicial"*. Escrito de apelación, Apéndice, pág. 50. En el alegato que presentó al tribunal de instancia reafirmó dicha aseveración al postular lo siguiente:

> En este caso los términos de los jueces están provistos en la Ley de la Judicatura. Esta dispone que los jueces ocuparán sus cargos hasta que su sucesor tome posesión.
>
> Evidentemente, la cláusula de continuidad *es parte del nombramiento por lo que es una extensión legítima del término básico* por el que fue debidamente confirmado por el Senado. Escrito de apelación, Apéndice, pág. 66.

Desde hace casi medio siglo tal ha sido el criterio de este Tribunal. Así, en *González v. Corte*, 62 D.P.R. 161, 164–165 (1943), nos manifestamos del modo siguiente:

> Convenimos sin vacilación en que bajo tales circunstancias "el período de *holding over es parte del término del cargo y el incumbente es un funcionario de jure".* (*Attorney General ex rel. McKenzie* v. *Warner*, 300 N.W. 63 (Mich., 1941), y que "El derecho de actuar *holding over* bajo esta disposición es tan parte del término del cargo como el mismo período regular fijado por estatuto". (*People ex rel. Warren et al.* v. *Christian et al.*, supra). Al mismo efecto, *Territory ex rel. Kock* v. *Mann*, 120 Pac. 313, [315] (N.M., 1911). *Es decir, en dichos casos la Legislatura, previendo que los términos de algunos funcionarios expirarían mientras el Senado está en receso, dispuso por mandato estatutario específico que se prorrogaran dichos términos hasta que sus sucesores fueran nombrados con el consejo y consentimiento del Senado.* Por tanto, no puede haber disputa alguna en cuanto a la teoría de que un funcionario que actúa bajo un estatuto de esta naturaleza está actuando *holding over* con título legal al cargo y que en su

consecuencia *no existe vacante en dicho cargo.* Es evidente que el estatuto tiene dos propósitos: (1) retener en todo momento en el cargo a una persona que ha sido nombrada con el consejo y consentimiento del Senado, incluyendo el período después de que su término ha expirado, *hasta que el Senado pueda reunirse y concurrir con el Gobernador en volverlo a nombrar o elegir su sucesor*; (2) evitar vacantes que la ley aborrece, toda vez que entorpecen la continuación de la administración de los asuntos públicos. (Énfasis suplido y en el original.)

Tras haber sido ratificado en *Acosta v. Corte,* 63 D.P.R. 651 (1944); *Fernández v. Corte,* 71 D.P.R. 161 (1950); *López v. Tribunal Superior,* 79 D.P.R. 20 (1956); *J.R.T. v. Milares Realty, Inc.,* 90 D.P.R. 844 (1964), y en *Betancourt v. Gobernador,* 119 D.P.R. 435 (1987), era de rigor, pues, el reconocimiento hecho por el Gobernador de que la cláusula de continuidad forma parte integrante del término del cargo de los jueces nombrados bajo la anterior legislación.

 Por otro lado, un empleado público tiene un reconocido interés en la retención de su empleo si dicho interés está protegido por ley o cuando las circunstancias del empleo le crean expectativa de continuidad. *Depto. Recs. Naturales v. Correa,* 118 D.P.R. 689, 693 (1987); *Pierson Muller I v. Feijoó,* 106 D.P.R. 838, 852 (1978); *Morales Narváez v. Gobernador,* 112 D.P.R. 761, 767 (1982). Toda vez que la cláusula de continuidad constituye parte del término del cargo del incumbente, los jueces nombrados bajo la vigencia de dicha cláusula *y con anterioridad a la vigencia de la Ley Núm. 17* tienen una legítima expectativa de que desempeñarán dicho puesto durante un término razonable luego de expirar el término para el cual fueron nombrados o hasta *que su sucesor tome posesión del cargo,* lo que ocurra primero. Esta expectativa de continuidad está protegida por ley. Los jueces nombrados al amparo de las disposiciones de la Ley de la Judicatura y de la Ley sobre Jueces Municipales que contenían cláusulas de continuidad sin términos específicos tienen, por lo tanto, una legítima expectativa de que permanecerán en sus cargos durante el tiempo razonable máximo permisible o hasta

que sus sucesores tomen posesión de sus cargos. *Perry v. Sindermann*, 408 U.S. 593 (1972); *Board of Regents v. Roth*, 408 U.S. 564 (1972); *Lupiáñez v. Srio. de Instrucción*, 105 D.P.R. 696 (1977). Hasta el límite constitucional que habremos de señalar más adelante, el mencionado interés propietario constituye una barrera infranqueable a la aplicación retroactiva de la Ley Núm. 17, ya que tal aplicación resultaría contraria a la cláusula constitucional que prohíbe la privación de la propiedad sin el debido proceso de ley. Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1.

A tono con lo antes dicho, resulta inescapable la conclusión al efecto de que la adopción de la mencionada ley no ha tornado académica la presente apelación, ya que dicho estatuto no pone fin a la controversia involucrada en este recurso por razón de que la Ley Núm. 17 no puede tener efecto retroactivo a los jueces incumbentes que fueron nombrados bajo la vigencia de las cláusulas de continuidad. Por lo tanto, continúan presentes las circunstancias quo originaron el recurso instado por los demandantes recurridos. *Comisión de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715 (1980).

## III

En este caso se plantea por primera vez ante este Tribunal si la cláusula de continuidad debe tener el efecto de mantener en sus puestos indefinida o eternamente a jueces cuyos términos han vencido. Esto es, si esta expectativa de continuidad debe tener límite y, de tenerlo, cuál sería el término máximo permisible. Aunque en el pasado hemos tenido ocasión de interpretar esta cláusula estatutaria, no habíamos enfocado nuestra atención hacia este particular problema. Ahora lo hacemos.

■ Conviene aclarar de salida que, como indicó Alexander Hamilton en J. Cooke, *The Federalist*, Connecticut, Wesleyan U. Press, 1961, pág. 455, sobre los nombramientos de receso, concluimos que la incumbencia en los cargos, en virtud de una cláusula de continuidad, es un medio *auxiliar* o *complementario*

de nombramientos que adquiere vigencia cuando el medio primario —el nombramiento que extiende el Gobernador con el consejo y consentimiento del Senado— no está adecuadamente asequible. Cuando en el pasado nos hemos referido a que "el período de *holding over* es parte del término del cargo y el incumbente es un funcionario *de jure*", ha sido a los efectos de que el funcionario concernido pueda descargar sus funciones, recibir emolumentos y otros beneficios (cotización para pensiones, etc.), y "evitar vacantes que la ley aborrece" hasta tanto el "Senado pueda reunirse" y considerar un nuevo nombramiento ya sea el del incumbente o el de un sucesor. *González v. Corte*, supra, págs. 164–165.

Nunca hemos decidido que, ya mediante la omisión por parte del Gobernador de remitir un nombramiento cuando el Senado se reúna en sesión ordinaria o ya mediante el rechazo por parte del Senado del nombramiento de un sucesor o mediante su omisión de actuar sobre el mismo, los incumbentes en cargos a término fijo puedan convertirse en incumbentes por término indefinido o ilimitado.

El tribunal de instancia postula como razón de resolver que "[s]i el Honorable Gobernador tarda uno, dos, tres u ocho años en enviar al Senado un nombramiento de juez, no tan s[ó]lo afecta a dicho juez sino que afecta además a la independencia judicial y despoja a la Rama Legislativa del poder constitucional de consejo y consentimiento". Escrito de apelación, Apéndice, pág. 15. Como remedio a la situación que describe, resolvió que el Gobernador está obligado a "descargar su poder de nombramiento dentro de un término relativamente corto". Íd., pág. 36. A esos fines estimó en ciento veinte (120) días a partir de la fecha en que vence el nombramiento el término dentro del cual tiene el Primer Ejecutivo que descargar dicha obligación. Al así actuar, el foro de instancia ignoró importantes preceptos constitucionales que ofrecen la solución al problema constitucional que se nos plantea. Veamos.

La tercera cláusula de la Sec. 4 del Art. IV de la Constitución del Estado Libre Asociado de Puerto Rico, *supra*, pág. 349, que fue objeto de interpretación parcial por nuestra parte en

*Hernández Agosto v. López Nieves*, supra, dispone como facultad del Gobernador la siguiente:

Nombrar, en la forma que se disponga por esta Constitución o por ley, a todos los funcionarios para cuyo nombramiento esté facultado. El Gobernador podrá hacer nombramientos cuando la Asamblea Legislativa no esté en sesión. *Todo* nombramiento que requiera el consejo y consentimiento del Senado o de ambas cámaras quedará sin efecto *al levantarse la siguiente sesión ordinaria.* (Énfasis suplido.)

 Allí señalamos que a los fines de evitar la indebida concentración de poder en una de las ramas de gobierno, la Convención Constituyente norteamericana acordó dividir la facultad de nombramiento entre las Ramas Ejecutiva y Legislativa. Tal acción "tuvo fuerte repercusión en la estructuración de la reputada versión estadounidense de la teoría sobre la separación de poderes". *Hernández Agosto v. López Nieves*, supra, pág. 618. Si bien esta doctrina fue adoptada por nuestra Constitución, 1 Diario de Sesiones de la Convención Constituyente 591 (1951), la misma no implica una independencia absoluta entre los poderes constitucionales. Con el fin de evitar la separación mecánica y con fronteras rigurosas, se diseñaron cláusulas constitucionales que establecen una función compartida entre las distintas ramas. Aunque de ordinario se asocia la facultad de nombramiento con el Poder Ejecutivo, se sostiene que el poder de nombramiento es compartido por el Ejecutivo y el Legislativo concurrentemente. Véase Comentario, *Abolition of Federal Offices as an Infringement on the President's Power to Remove Federal Executive Officers: A Reassessment of Constitutional Doctrines*, 42 Fordham L. Rev. 562, 567 (1974). Siguiendo esta misma línea de pensamiento, dictaminamos en *Hernández Agosto v. López Nieves*, supra, pág. 620:

La doctrina de separación de poderes y el sistema democrático mismo de gobierno presuponen, en lo que atañe a las facultades compartidas como es la de nombramiento, la búsqueda del consenso, el logro del equilibrio necesario para realizar las tareas del gobierno. En lo que atañe a nombramientos, la Rama Ejecutiva no

puede despojar a la Rama Legislativa del poder de confirmación que le confieren la Constitución y las leyes. Tampoco puede el Senado o la Rama Legislativa usurpar el poder de nominación del señor Gobernador mediante afirmaciones indicativas de que confirmará a determinado candidato.

La indefinición en el término de duración de una incumbencia *holding over* atenta contra el equilibrio que intenta mantener la Constitución en lo que respecta al ejercicio de nombramiento compartido por la Rama Ejecutiva y la Legislativa. Tal indefinición abona el terreno para que se produzca una situación en la que se trastoque el firme equilibrio deseado a la hora de extender nombramientos que requieran consejo y consentimiento del Senado. La Rama Legislativa podría imponerle su criterio al Ejecutivo con tan sólo rechazar, por acción o inacción —cuando aquella esté en sesión— la sustitución hecha por éste de un incumbente cuyo nombramiento ha expirado. En tal caso, el poder que le corresponde al Ejecutivo en la función de nombrar *se ve socavado*, no porque el Ejecutivo no pueda hacer la nominación al efecto, pues de hecho la hace, *sino porque la misma no tiene ninguna efectividad.*

Lo mismo puede ocurrir a la inversa. Si el Ejecutivo desea que un incumbente en un cargo con cláusula de continuidad permanezca en el mismo indefinidamente sin que la Legislatura se exprese sobre su confirmación para un nuevo término, lo único que tiene que hacer es no enviar nombramiento alguno a la Legislatura. El efecto de esto es, también, claramente *socavar la función constitucional del Senado en la participación de los procesos de nombramiento y confirmación.*

A la luz de lo expuesto, la interpretación literal de las cláusulas de continuidad contenidas en las Secs. 12 y 17(c) de la Ley de la Judicatura, *supra*, y en el Art. 1 de la Ley sobre Jueces Municipales, *supra*, en cuya interpretación parece descansar el ilustrado juez de instancia, no puede prevalecer. Tal interpretación choca abiertamente con la doctrina de separación de poderes ínsita en la cláusula de nombramientos de nuestra Constitución. Admitir que un funcionario público —cuyo nombramiento a un

cargo sea con cláusula de continuidad— pueda permanecer indefinidamente en el puesto por todo el tiempo que pueda concebiblemente tomarle a los mencionados poderes ponerse de acuerdo en cuanto a un nuevo nombramiento tendría el efecto de dar rienda suelta a cualquiera de dichos dos (2) poderes para perpetuar en su puesto a un incumbente cuyo término ha expirado, en contravención al criterio del otro respecto a las cualidades o ejecutorias de dicho incumbente.

■ El mandato de la Constitución es diáfanamente claro: el nombramiento de los jueces es compartido por el Ejecutivo y la Legislatura, y el ejercicio de las funciones de cada uno de estos poderes no puede darse, en función de la doctrina constitucional reseñada, a merced del ejercicio de la función constitucional del otro.

■ Por las razones expuestas, tenemos que concebir el período de continuidad en el cargo luego de la expiración del término (*holding over*) como un período adicional para dar oportunidad a *ambos poderes* de descargar su función constitucional de nombramiento y evitar el perjuicio que la vacante en el puesto acarrea. En el caso de *Hernández Agosto v. López Nieves*, supra, pág. 621, dijimos que "todo interinato en cargos que requieran el consejo y consentimiento del Senado quedará sin efecto en virtud de la Constitución del Estado Libre Asociado de Puerto Rico, al levantarse la sesión ordinaria de la Asamblea Legislativa en curso o, en su defecto, la siguiente, al comienzo del interinato, a menos que se efectúe antes del nombramiento en propiedad". (Escolio omitido.) Esa y no más es la expectativa de continuidad que puede tener un funcionario incumbente bajo una cláusula de continuidad.

■ Resolvemos, pues, que el término de duración del período posterior a la expiración del término del incumbente (*holding over*) en virtud de la llamada cláusula de continuidad no es ilimitado. El mismo se extendería hasta que su sucesor tome posesión del cargo pero nunca después de finalizada la próxima

sesión legislativa siguiente a dicha expiración.(2) Si los Poderes Ejecutivo y Legislativo no logran llegar a un acuerdo sobre la renominación del incumbente o su sucesor antes de finalizada la sesión ordinaria señalada, el cargo quedaría vacante hasta tanto ambos poderes descarguen su obligación constitucional de nombramiento. Este resultado está acorde con la doctrina de separación de poderes y con la razones estatutarias que inspiraron la cláusula de continuidad.

Aun cuando el resultado de este método de nombramientos, al igual que el de los nombramientos de receso, puede ser la eventual creación de una vacante, ésta surgiría *después* de que *ambos* poderes constitucionales hayan tenido la oportunidad de considerar el asunto. Si no lo resolvieron, podemos presumir la existencia de un *impasse* que la continuación en el cargo por el incumbente puede eternizar. La vacante permite en ese caso que el proceso constitucional de nombramiento continúe y se acelere. Esa continuación puede darse inmediatamente, pues la vacante se *puede y debe* cubrir con un nombramiento de receso que da lugar a que se reanude el proceso.

La práctica de mantener en sus cargos por tiempo indefinido, después de la expiración de su nombramiento, a algunos funcionarios cuyos términos incluyen una cláusula de continuidad no es nada nuevo. La misma viene observándose desde hace mucho tiempo. Toda vez que esta es la primera ocasión, sin embargo, en que tenemos la oportunidad de expresarnos sobre la legalidad de la misma, resolvemos como medida transitoria que aquellos funcionarios que continúen desempeñándose en sus cargos en virtud de la mencionada cláusula aun después de una o varias sesiones legislativas, luego de haber expirado el término para el cual fueron nombrados, podrán permanecer en los mismos hasta que sus sucesores tomen posesión de tales cargos o hasta la terminación de la presente sesión legislativa, lo que primero ocurra.

---

(2) Es decir, cuando la expiración del cargo se produce en el curso de una sesión ordinaria de la Asamblea Legislativa el período de continuidad se extiende hasta la terminación de la próxima sesión ordinaria.

IV

Como ya hemos expresado, los errores señalados por el apelante relacionados con la falta de legitimación activa de los Senadores recurridos —la ausencia de partes indispensables y que el asunto planteado no es justiciable— no fueron cometidos. Véanse: *Nogueras v. Hernández Colón*, 127 D.P.R. 405 (1990); *Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986); *Hernández Agosto v. López Nieves*, supra; *Hernández Agosto v. Romero Barceló*, supra.

■ Toda vez que, a la luz del resultado a que hemos llegado, los efectos de la Ley Núm. 17 no han de madurar en una controversia justiciable hasta que venza por lo menos el primer nombramiento hecho bajo su vigencia —no antes de cinco (5) años en el caso de los Jueces Municipales— resulta improcedente pronunciarnos sobre la constitucionalidad de dicho estatuto. Por lo tanto, se declara sin lugar la "Moción solicitando permiso para impugnar en este recurso la constitucionalidad de la Ley 17 de 21 de Julio de 1990" presentada por los Senadores recurridos. Igualmente resulta improcedente, por académica, la "Moción, urgente en auxilio de jurisdicción" presentada por dicha parte.

Por todo lo antes expuesto, *se dictará sentencia mediante la cual se revoca la dictada el 2 de mayo de 1990 por el Tribunal Superior, Sala de San Juan.*

El Juez Asociado Señor Negrón García disiente con opinión escrita y un voto preliminar que remitió para su certificación el 10 de septiembre de 1990. El Juez Asociado Señor Rebollo López disiente. Todos los Jueces se reservan el derecho de expresarse al amparo de la Regla 4 de Tribunal Supremo de Puerto Rico.

—o—

Voto preliminar del Juez Asociado Señor Negrón García.

San Juan, Puerto Rico, a 10 de septiembre de 1990.

A modo de *Prólogo* unas expresiones sobre la peculiar y grave situación institucional suscitada en este recurso. Esta ponencia tiene fecha de 10 de septiembre de 1990. *No es un error.* Ese día fue remitida al Secretario del Tribunal, Lcdo. Francisco R. Agrait Lladó, para que fuera certificada y notificada a las partes inmediatamente y, por su condición de documento público judicial, unida a los autos.

Ese trámite no pudo seguirse. Mediante una actuación equivalente a una "mordaza judicial" temporera —análoga a la que en ocasiones se aplica a las voces disidentes o minorías políticas en otras ramas del Gobierno— una mayoría del Tribunal compuesta por el Juez Presidente Señor Pons Núñez y los Jueces Asociados Señores Hernández Denton, Alonso Alonso y Andréu García, acordó detener el trámite de certificación. Ello después de oponerse a nuestra solicitud de que se convocara para hoy una sesión extraordinaria del Pleno con el propósito de considerar, con carácter urgente, si la presente apelación era o no académica en virtud de la Ley Núm. 17 de 21 de julio de 1990 (4 L.P.R.A. secs. 92, 152 y 211) y, claro está, si en sus méritos planteaba una cuestión constitucional sustancial.

Este intento de silenciar temporeramente las manifestaciones de la conciencia judicial disidente de uno de sus miembros atenta contra las mejores tradiciones de este Foro. Se trata de la necesidad de resolver el *mandamus* rápidamente, aspecto crucial en el caso de autos. La divergencia surgida es legítima. Ante la misma, el curso de acción correcto debió ser la adopción de una *resolución* en la que se hiciera constar el desacuerdo mayoritario con nuestra propuesta por considerarla prematura y a destiempo, la censura o la exposición de cualquiera otras razones como: ser contrario al reglamento, exceso de trabajo, falta de preparación, no estar en condiciones de participar ni votar, etc. ¡Cuán distinto hubiese sido! Con esa resolución hubiésemos certificado nuestra

ponencia, prevaleciendo así la buena tradición institucional de tolerancia hacia las voces disidentes, a tono con el axioma de respeto a la dignidad humana que destella nuestra Constitución. No podemos olvidar que las "diferencias y los conflictos no perturban la solidaridad de los seres humanos en el bien común sino que, por el contrario, la fortalece y afianza". Informe de la Comisión de la Carta de Derechos, 4 Diario de Sesiones de la Convención Constituyente 2563 (1951).

Se impone una breve explicación de nuestro firme convencimiento e insistencia respecto a que la presente apelación amerita una pronta atención e inmediata adjudicación bajo la Regla 50 de nuestro Reglamento, 4 L.P.R.A. Ap. I-A, que prescinde de cualesquiera términos "en orden al más justo y eficiente despacho del caso".

Es obvio que hasta que este Tribunal decida si procede o no la apelación presentada hace más de tres (3) meses (1ro de junio de 1990) por el demandado apelante, Honorable Gobernador Rafael Hernández Colón, continuarán en suspenso los efectos y las obligaciones impuestas por el Tribunal Superior en el *mandamus*. Regla 53.9 de Procedimiento Civil, 32 L.P.R.A. Ap. III.

También es evidente que ello sólo favorece al Primer Ejecutivo, pues de confirmarse ese decreto vendría obligado a acatarlo. El factor tiempo era y es esencial, pues precisamente hoy, 10 de septiembre de 1990, se inician las labores del Senado según la legislación que estableció dos (2) sesiones *ordinarias* anuales.

A tenor con los términos originales del *mandamus* emitido por el tribunal de instancia, el Gobernador está obligado a remitir al Senado las renominaciones o sustitutos de por lo menos seis (6) jueces dentro de los primeros cinco (5) días de esta sesión, o sea, a más tardar el próximo viernes 14 de septiembre. Este Tribunal deberá resolver en un término razonable durante la presente sesión legislativa. Y es que el Gobernador no puede sustituir a los jueces cobijados por la cláusula de continuidad (*holding over clause*) durante el receso del Senado. Cf. *Betancourt v. Gobernador*, 119 D.P.R. 435 (1987).

Ante esta realidad, ¿debemos mantener al Gobernador y al Senado en este estado de incertidumbre? ¿Debemos arriesgarnos a que ambos pierdan la oportunidad de descargar sus respectivas prerrogativas durante esa sesión? ¿Por qué situar al Primer Ejecutivo en una encrucijada frente al Senado, producto más bien de la inercia e irresolución judicial? En su otra dimensión, ¿debemos mantener a los seis (6) jueces —y aquellos otros que en los próximos días y semanas advendrán a igual *status*— en semejante limbo jurídico? Sinceramente creemos que no.

La decisión de si el *mandamus* y la apelación del demandado Honorable Gobernador Rafael Hernández Colón es o no académica a la luz de la Ley Núm. 17, *supra*, es de fácil determinación. Aparte de los fundamentos expuestos en el texto principal de nuestra ponencia, bastaría recordar que dicha ley no entrará en vigor hasta el próximo 19 de octubre. Mientras no resolvamos, repetimos, subsistirá la incógnita de si procedía el *mandamus* y, por ende, si el Honorable Gobernador Rafael Hernández Colón tenía la obligación insoslayable de remitir al Senado en o antes del viernes 14 de septiembre las renominaciones o sustitutos de seis (6) jueces.

Con este trasfondo en mente, contestemos las interrogantes planteadas a través de nuestro voto preliminar sin menoscabo de ampliarlo antes de ser certificado, en ocasión de que la mayoría se decida a actuar de algún modo, lo cual en bien de la justicia le instamos a que lo haga pronto.

Del horizonte decisorio de la presente apelación emergen cuatro (4) principios básicos.

*Primero*, la Asamblea Constituyente, al organizar los tres (3) poderes que constituyen la forma republicana de gobierno, tuvo en mente —como instrumento democrático del pueblo— "[e]l propósito de eficiencia en la organización y funcionamiento de la rama judicial, [que] está íntimamente vinculado y depende fundamentalmente . . . [de] *la independencia del poder judicial*". (Énfasis suplido.) 1 Diario de Sesiones de la Convención Constituyente 452 (1951).

*Segundo*, la Constitución rechazó la independencia *absoluta* de los poderes entre sí. 3 Diario de Sesiones de la Convención Constituyente 1918–1919 (1952). "La doctrina de separación de poderes y el sistema democrático mismo de gobierno presuponen, en lo que atañe a las facultades compartidas como es la de nombramiento, la búsqueda del consenso, el logro del equilibrio necesario para realizar las tareas del gobierno. *En lo que atañe a nombramientos, la Rama Ejecutiva no puede despojar a la Rama Legislativa del poder de confirmación que le confieren la Constitución y las leyes.* Tampoco puede el Senado o la Rama Legislativa usurpar el poder de nominación del señor Gobernador mediante afirmaciones indicativas de que confirmará únicamente a determinado candidato." (Énfasis suplido.) *Hernández Agosto v. López Nieves*, 114 D.P.R. 601, 620 (1983).

*Tercero*, la facultad del Gobernador de hacer y someter nombramientos al Senado para su consejo y consentimiento no es absoluta. En términos de tiempo, requiere un ejercicio razonable.

*Cuarto*, a tono con el espíritu del Art. V, Sec. 8 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, la cláusula de continuidad (*holding over clause*) forma parte integrante del término del cargo de los jueces y no puede ser menoscabada ni eliminada legislativamente.

I

El 10 de mayo de 1989 los Lcdos. Nicolás Nogueras, Hijo y Rolando A. Silva —miembros de la representación del Partido Nuevo Progresista en el Senado de Puerto Rico— presentaron ante el Tribunal Superior, Sala de San Juan, una petición de *mandamus* contra el Honorable Gobernador Rafael Hernández Colón.

En síntesis, alegaron que a esa fecha un total de cuarenta (40) jueces —ocho (8) superiores, quince (15) de distrito y diecisiete (17) municipales— tenían sus nombramientos vencidos; que le habían solicitado al Primer Ejecutivo, sin éxito, que sometiera a la consideración del Senado los nombramientos para cubrir los

puestos ocupados por jueces con nombramientos originales vencidos que continuaban desempeñándose bajo la cláusula de continuidad, y que ello constituía *una usurpación de la función constitucional del Senado* que a la par afectaba "el funcionamiento libre e independiente del poder judicial". Escrito de apelación, Apéndice, pág. 44. Suplicaron que se ordenara al Gobernador que sometiera los nombramientos.

Oportunamente el Gobernador compareció. Como defensas principales levantó la improcedencia del recurso de *mandamus* por versar sobre el ejercicio de una prerrogativa constitucional discrecional no sujeta a revisión judicial y, además, adujo que el asunto no era justiciable. Específicamente señaló que *"no se acepta[ba]* que a los jueces allí aludidos SE LES HAYA VENCIDO SU NOMBRAMIENTO, PUES LES COBIJAN LAS CLÁUSULAS DE CONTINUIDAD ESTABLECIDAS POR LA LEY DE LA JUDICATURA *QUE SON PARTE DEL TÉRMINO DE SU NOMBRAMIENTO AL CARGO JUDICIAL"*. (Énfasis suplido.) Escrito de apelación, Apéndice, pág. 50.

Acaecieron distintos trámites y el caso quedó sometido. El tribunal, "ante la alternativa de una solución que no conllevara acción judicial", prudencialmente retrasó su disposición. Finalmente, el 2 de mayo de 1990 dictó sentencia (Hon. Gilberto Gierbolini, Hijo). En la misma, aun cuando se reconoció que el Gobernador había remitido varios nombramientos y que el Senado había actuado sobre ellos —y por ende, el número de jueces en la situación descrita se había reducido— consignó que todavía quedaban pendientes dos (2) nombramientos de jueces superiores —vencidos el 11 de agosto de 1987 y el 15 de mayo de 1989 respectivamente— tres (3) de distrito —vencidos desde el 2 de octubre de 1985, 13 de junio de 1987 y 5 de septiembre de 1987— e igual número de jueces municipales, cuyos nombramientos expiraron en 4 de diciembre de 1983, 6 de febrero de 1985 y 4 de enero de 1989. Expuso, además, que durante el transcurso del presente año (1990) vencerían los términos correspondientes a cinco (5) jueces superiores, dieciséis (16) de distrito y once (11) municipales.

Ante esta realidad, concluyó que la controversia no era académica sino, por el contrario, susceptible de repetirse. Luego, en documentada sentencia, reconoció la capacidad jurídica de los demandantes Nogueras, Hijo y Silva, la justiciabilidad del planteamiento, su estrecha relación con una verdadera independencia judicial y que procedía el *mandamus* fundado en un interés público apremiante justificativo de una pronta y definitiva adjudicación. Como remedio específico, ordenó al Honorable Gobernador Rafael Hernández Colón a "enviar al Senado para su consejo y consentimiento dentro de los próximos ciento veinte días, nombramientos, bien sean los actuales incumbentes o sus sustitutos, para cubrir los cargos de jueces cuyos términos han expirado". Escrito de apelación, Apéndice, pág. 36. Consignó que este "término de ciento veinte días ser[ía] aplicable además, a todo nombramiento que ven[ciera] con posterioridad a esta determinación". Íd., págs. 36–37.

Inconforme, *el pasado 1ro de junio de 1990* el Honorable Gobernador Rafael Hernández Colón apeló por conducto del Procurador General.

Poco después, la Asamblea Legislativa aprobó y el propio Honorable Gobernador Rafael Hernández Colón refrendó la Ley Núm. 17, *supra*. En lo pertinente, ese nuevo estatuto "suprim[ió] la cláusula de continuidad en el ejercicio de [los] cargos" de jueces del Tribunal Superior, Distrito y Municipal. 1990 Leyes de Puerto Rico 83. A esos efectos, sus Arts. 1, 2 y 3 dispusieron que esos jueces cesarían "en sus funciones a los noventa (90) días de vencerse [sus] término[s] si no ha sido renominado o cuando su sucesor tome posesión de su cargo, lo que ocurra primero". Íd., pág. 84. A todos, de ser renominados y confirmados, "el término del nuevo nombramiento comenzará a contar desde la fecha en que venció el término anterior". Íd. Si el Senado los rechaza, cesan inmediatamente en sus cargos.

Por último, conforme al Art. 4 de la citada Ley Núm. 17 (4 L.P.R.A. sec. 92n.), ésta entrará en vigor noventa (90) días después de su aprobación, o sea, el 19 de octubre de 1990, y se

hace extensiva *a todos los jueces*, incluso a aquellos que fueron nominados y confirmados antes de su vigencia.

En el historial y en la exposición de motivos del estatuto se *reconoce* que "el *término de noventa (90) días* para que un juez cese en sus funciones es uno que *cumple con los criterios de razonabilidad establecidos, permitiendo al Ejecutivo llevar a cabo el proceso de evaluación y nombramiento* y permitiendo al juez cumplir con [la] responsabilidad asumida". Informe de la Comisión de lo Jurídico del Senado de 19 de junio de 1990, pág. 5.

Así las cosas, el *3 de agosto* una sala especial de verano integrada por el Juez Presidente Señor Pons Núñez, el Juez Asociado Señor Rebollo López y la Juez Asociada Señora Naveira de Rodón concedió a las partes término para que comparecieran a expresarse sobre la posible academicidad del recurso, en vista de las disposiciones de la Ley Núm. 17 antes aludida. En esa ocasión el Juez Asociado Señor Rebollo López disintió y consignó que acaptaría y daría curso a la apelación.

Contamos con el beneficio de esa comparecencia. El Procurador General discute extensamente la doctrina de academicidad. Expone que, al presente, en virtud de la cláusula de continuidad, sólo seis (6) jueces están en esa situación. Sostiene que con la aprobación de la Ley Núm. 17, *supra*, la apelación es académica. Aduce que esta ley es constitucionalmente válida en su aplicación retroactiva y en cuanto limita la cláusula de continuidad a un máximo de noventa (90) días. Argumenta que dicha cláusula no goza de rango constitucional. Por su parte, los apelados Nicolás Nogueras, Hijo y Rolando Silva exponen que la "controversia entre los senadores comparecientes y el Primer Ejecutivo no es colusoria ni ficticia. Persistirá mientras el ejercicio del poder constitucional de consejo y consentimiento de los senadores comparecientes esté a merced del capricho del Señor Gobernador para escoger el momento que a él le parezca oportuno para enviar nombramientos". Moción en cumplimiento de orden, págs. 5–6. Añaden que la "enmienda aprobada mediante la Ley Núm. 17 no aborda la práctica del Gobernador condenada en la Sentencia

apelada ni le ordena enviar los nombramientos judiciales dentro de determinado período". Íd., pág. 7.

## II

De entrada, una aclaración. La apelación ante nos plantea una cuestión constitucional sustancial que trasciende el señalamiento sobre la legitimación activa de los demandantes Nicolás Nogueras, Hijo y Rolando Silva para presentar la acción y la contención de que los jueces eran partes indispensables. Nos referimos al planteamiento central del Honorable Gobernador Rafael Hernández Colón sobre la improcedencia del *mandamus* por tratarse del ejercicio de una facultad constitucional ejecutiva de discreción absoluta y, además, de su posible academicidad por razón de la aprobación de la Ley Núm. 17, *supra.*

Ciertamente el interés público que reviste la cuestión debe ser motivo suficiente para que resolvamos inmediatamente. Máxime cuando estamos ante una cuestión de derecho que afecta sustancialmente la funcionalidad y prerrogativas de los tres (3) poderes constitucionales. Tan recientemente como en los pasados 31 de agosto y 4 de septiembre de 1990 atendimos preferentemente y resolvimos con prioridad —aun durante el receso de verano— los casos *Granados v. Rodríguez Estrada V,* 127 D.P.R. 1 (1990), desestimación del pleito de impugnación de la elección para la alcaldía de San Juan, y *Nogueras v. Hernández Colón,* 127 D.P.R. 405 (1990), constitucionalidad de una segunda sesión ordinaria anual.

El presente voto responde a ese imperativo circunstancial y al espíritu vindicador que frecuentemente se le presenta al jurista en cuestiones que atañen a la supervivencia de un sistema democrático que proclama regirse por el imperio de la ley. Como resolviera el ilustrado juez de instancia, por razón de la práctica seguida por el Honorable Gobernador Rafael Hernández Colón, los miembros de la Judicatura tienen "suspendida sobre sus cabezas por tiempo irrazonable una horrible espada de Dámocles que nadie sab[rá] cuándo y en qué forma descender[á]". Escrito de apelación, Apéndice, pág. 5.

## III

En su primer apuntamiento, el Honorable Gobernador Rafael Hernández Colón cuestiona la legitimación activa de Nicolás Nogueras, Hijo y de Rolando Silva. No tiene razón. Innumerables decisiones del pasado y más recientes han reconocido *expresa* o *implícitamente* el derecho individual que asiste a los legisladores de comparecer a los tribunales para reivindicar las prerrogativas de sus cargos. *Nogueras v. Hernández Colón*, supra; *Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986); *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407, 415–416 (1982). Compárese, además, *Noriega v. Gobernador*, 122 D.P.R. 650 (1988).

Y es que

. . . distinto a la Constitución federal, la nuestra RECONOCIÓ Y GARANTIZÓ expresamente, como medio de fiscalización, a las minorías legislativas. "A tal fin, es básico para la *salud democrática* que las minorías tengan una representación que, *aun bajo las circunstancias más desfavorables*, les permita cumplir adecuadamente su función de fiscalizar y estimular a la mayoría en su obra de gobierno sin crear entorpecimientos que puedan resultar en detrimento de la democracia." (Énfasis suplido.) Diario de Sesiones, *supra*, Vol. 4, pág. 2590. *Cuando por razones partidistas la mayoría no actúa en defensa de las prerrogativas del cuerpo, ¿cómo negarle a un legislador minoritario acudir a los tribunales en reivindicación del mismo?* Si éste no puede hacerlo, ¿quién entonces podrá "cumplir adecuadamente [la] función de fiscalizar" a la mayoría? Íd. En tales circunstancias, no concebimos que las puertas de los tribunales puedan cerrársele. Claro está que para que prevalezca tiene que demostrar la procedencia de su causa de acción, esto es, la inconstitucionalidad e ilegalidad del acto ejecutivo impugnado y su nexo racional. Aun bajo la experiencia norteamericana, "procede reconocerle a un legislador legitimación activa (*standing*) cuando demuestra que la actuación impugnada tiene el efecto de anular su voto, pasado o futuro, o cuando están en juego otros aspectos fundamentales de sus prerrogativas legislativas". (Traducción nuestra.) L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, pág. 153.

Para la consideración de cuestiones de vasto interés público, la "tendencia actual es decididamente hacia la liberalización y simpli-

ficación de las normas que rigen esta zona del Derecho" (*E.L.A. v. P.R. Tel. Co.*, 114 D.P.R. 394, 398 (1983)) y hay que sopesar a "plena luz, a las fuerzas subyacentes que motivan en la realidad la abstención o intervención judicial en una situación dada". Íd., pág. 399. Véase, también, *Salas Soler v. Srio. de Agricultura*, 102 D.P.R. 716 (1974). (Énfasis suplido y en el original.) *Noriega v. Hernández Colón*, 126 D.P.R. 42, 72–73 (1990), voto disidente.

En relación con el anterior señalamiento, el Honorable Gobernador Rafael Hernández Colón nos argumenta como defecto procesal que los jueces, partes indispensables en este pleito, no fueron acumulados. Tampoco tiene razón.

Basta recordar que los promoventes principales son los Senadores Nicolás Nogueras, Hijo y Rolando Silva. Los jueces afectados, al igual que aquellos otros cuyos nombramientos originales vencerán próximamente —y permanecerán en sus cargos por razón de la cláusula de continuidad— desde el punto de vista procesal son protagonistas secundarios, no indispensables. Rigen nuestros pronunciamientos en *Hernández Agosto v. Romero Barceló*, supra, pág. 413, a los efectos de que "*la razón de pedir en este caso el envío de las nominaciones de los funcionarios concernidos al Senado nada requiere de éstos*, y más aún, nada puede requerirles porque *ellos no tienen incumbencia en el asunto.* Por tal razón, la controversia puede dilucidarse en ausencia de dichos funcionarios sin riesgo de que tal omisión pueda dar motivo a multiplicidad de pleitos o frustrar la concesión de un remedio efectivo y completo". (Énfasis suplido.)

Tampoco puede sostenerse que estamos ante una "cuestión política" vedada a nuestra intervención. La doctrina de cuestión política ha evolucionado notablemente. Después de todo, definir los límites y la validez del ejercicio de las facultades conferidas por la Constitución a los otros poderes son asuntos cuidadosamente reservados a los tribunales. *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750 (1977); *P.S.P. v. E.L.A.*, 107 D.P.R. 590 (1978). En Puerto Rico la doctrina de cuestión política nunca ha tenido el mismo arraigo que en Estados Unidos. *Silva v. Hernández Agosto*, supra, pág. 54.

El Primer Ejecutivo no puede, como tampoco los cuerpos legislativos, convertirse en los jueces constitucionales de sus propios poderes. Ese papel corresponde exclusivamente al Poder Judicial. "Y es que la Constitución provee un esquema de pesos y contrapesos para regir procesos duraderos, más allá de un cuatrienio en particular. No debe, pues, confundirse la armonía pasajera y el consenso coyuntural propio de un momento en que *un solo partido político controla ambas ramas*. Por esa razón la presente decisión, al igual que cualesquiera otras, tiene que superar esa visión inmediata y debe ser capaz de proyectarse hacia el futuro con mayor perspectiva." (Énfasis en el original.) *Nogueras v. Hernández Colón*, supra, pág. 429, opinión disidente. La mera posibilidad de que surjan conflictos con las otras ramas de gobierno por razón de una interpretación judicial adversa no justifica abdicar nuestra responsabilidad constitucional.

## IV

Superados estos escollos procesales —legitimación de las partes, indispensabilidad y cuestión política— examinemos la alegada academicidad del recurso por razón de la Ley Núm. 17, *supra*. Este ángulo es inseparable del apuntamiento medular de la apelación: naturaleza y límites del poder del Primer Ejecutivo para nombrar jueces.

La fuente legal primaria es la Constitución. Entre los atributos y deberes del Gobernador, le reconoce "[n]ombrar, *en la forma* que se *disponga* por esta *Constitución* o *por ley*, a todos los funcionarios para cuyo nombramiento esté facultado". (Énfasis suplido.) Art. IV, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 349.

El legajo de la Asamblea Constituyente revela una clara intención de asignarle al Senado un papel importante en este proceso, el cual debe ejercer con razonabilidad. Así, en el Art. V, Sec. 8 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, ed. 1982, pág. 360, dispuso que todos los jueces serían nombrados "por el Gobernador con el consejo y consentimiento

del Senado". *Pero el mandato fue más allá.* Se aclaró que "[l]os *términos* de los cargos de los demás jueces [excepto los del Supremo] *se fijarán por ley y no podrán ser de menor duración que la prescrita* para los cargos de jueces de igual o *equivalente categoría existentes en la fecha en que comience a regir esta Constitución".* (Énfasis suplido.) Íd.

El alcance de este precepto constitucional fue explicado a la Asamblea Constituyente por el Presidente de la Comisión de la Rama Judicial, Lcdo. Ernesto Ramos Antonini, *COMO UNA DE LAS CARACTERÍSTICAS GARANTIZADORA DE LA INDE-PENDENCIA JUDICIAL*, "puesto que establece categóricamente, que *no se podrá reducir el término actual* de los jueces de distintas categorías, *según están establecidas actualmente por ley, si bien les permite aumentar el término".* (Énfasis suplido.) 1 Diario de Sesiones de la Convención Constituyente 453 (1951); Diario de Sesiones, *supra,* Vol. 3, pág. 2611. DE ESTE MODO SE ELEVÓ A RANGO CONSTITUCIONAL, EN INTENCIÓN Y ESPÍRITU, LA CLÁUSULA DE CONTINUIDAD. Nos explicamos.

Hasta el momento de entrar en vigor la Constitución regía la primera Ley Orgánica de la Judicatura de Puerto Rico, Ley Núm. 432 de 15 de mayo de 1950, que en sus Arts. 20 y 31 prescribía para los cargos de jueces municipales y de distrito términos de cuatro (4) y doce (12) años respectivamente y, además, hasta que los sucesores tomaran posesión de sus cargos.

Para poner en vigor el mandato constitucional de que los términos de los jueces serían fijados por ley y "no podr[í]an ser de menor duración que la prescrita para los cargos de jueces de igual o equivalente categoría existentes en la fecha en que comen[zó] a regir la Constitución", el 24 de julio de 1952 la Asamblea Legislativa aprobó una nueva *Ley de la Judicatura del Estado Libre Asociado de Puerto Rico*, efectiva el *mismo día* de la Constitución. En lo pertinente, bajo la nomenclatura de jueces de distrito y superior —pero de la *misma* equivalencia y categoría funcional que la de los municipales y superiores preexistentes— prescribió términos iguales o mayores para esos jueces del

Tribunal de Primera Instancia *Y LOS MANTUVO A TODOS COBIJADOS BAJO LA CLÁUSULA DE CONTINUIDAD.*

La naturaleza y extensión de esta cláusula ha sido examinada en diversas ocasiones. Como norma preconstitucional fue avalada en *González v. Corte*, 62 D.P.R. 161 (1943); *Acosta v. Corte*, 63 D.P.R. 651 (1944); *Fernández v. Corte*, 71 D.P.R. 161 (1950). Después de la Constitución, fue reiterada en *Betancourt v. Gobernador*, 119 D.P.R. 435 (1987); en *López v. Tribunal Superior*, 79 D.P.R. 20 (1956), y en *J.R.T. v. Milares Realty, Inc.*, 90 D.P.R. 844 (1964).

Sobre su alcance y propósito, continúan vigentes los pronunciamientos siguientes:

Convenimos sin vacilación en que bajo tales circunstancias "el período de *holding over es parte del término del cargo y el incumbente es un funcionario de jure.*" (*Attorney General ex rel. McKenzie* v. *Warner*, 300 N.W. 63 (Mich., 1941)), Y QUE "EL DERECHO DE ACTUAR *HOLDING OVER* BAJO ESTA DISPOSICIÓN ES *TAN PARTE DEL TÉRMINO DEL CARGO COMO EL MISMO PERÍODO REGULAR FIJADO POR ESTATUTO*". (*People ex rel. Warren et al.* v. *Christian et al.*, supra). Al mismo efecto, *Territory ex rel. Kock* v. *Mann*, 120 Pac. 313, [315] (N.M., 1911). *Es decir, en dichos casos la Legislatura, previendo que los términos de algunos funcionarios expirarían mientras el Senado está en receso, dispuso por mandato estatutario específico que se prorrogaran dichos términos hasta que sus sucesores fueran nombrados con el consejo y consentimiento del Senado.* POR TANTO, *NO PUEDE HABER DISPUTA* ALGUNA EN CUANTO A LA TEORÍA DE QUE UN FUNCIONARIO QUE ACTÚA BAJO UN ESTATUTO DE ESTA NATURALEZA ESTÁ ACTUANDO *HOLDING OVER* CON TÍTULO LEGAL AL CARGO Y QUE EN SU CONSECUENCIA *NO EXISTE VACANTE EN DICHO CARGO.* Es evidente que el estatuto tiene dos propósitos: (1) retener en todo momento en el cargo a una persona que ha sido nombrada con el consejo y consentimiento del Senado, incluyendo el período después de que su término ha expirado, *hasta que el Senado pueda reunirse y concurrir con el Gobernador en volverlo a nombrar o elegir su sucesor;* (2) evitar vacantes que la ley aborrece, toda vez que entorpecen la continuación de la administración de los asuntos públicos. (Énfasis suplido.) *González v. Corte*, supra, págs. 164–165.

Según fue indicado antes, el Honorable Gobernador Rafael Hernández Colón *reconoció* en su contestación a la demanda de *mandamus* que las cláusulas de continuidad establecidas en la ley para los miembros de la Judicatura de instancia "son *parte del término* de su nombramiento al cargo judicial". (Énfasis suplido.) Escrito de apelación, Apéndice, pág. 50. En el memorando de derecho que le fue presentado al foro de instancia reafirmó esa posición así: "En este caso los términos de los jueces están provistos en la Ley de la Judicatura. Esta dispone que los jueces ocuparán sus cargos, *hasta que su sucesor tome posesión. Evidentemente*, la cláusula de continuidad es *parte* del nombramiento por lo *que es una extensión legítima del término básico* por el que fue debidamente confirmado por el Senado. (Énfasis suplido y en el original.) Escrito de apelación, Apéndice, pág. 66. También en su Escrito de apelación reitera firmemente, en varias ocasiones, ese convencimiento (págs. 35 y 41–42).

Su postura coincide con la asumida antes por el Senado de Puerto Rico en el caso *Betancourt v. Gobernador*, supra, en Alegato del Senado, págs. 17, 19, 26, 33 y 34. A tal efecto, dicho cuerpo sostuvo allí que "la Asamblea Constituyente necesariamente adoptó dicha interpretación . . . . Por tanto, una cláusula de continuidad dispuesta por ley al fijar el término de un cargo tiene el mismo efecto práctico que si hubiese sido incluida en la Constitución". Íd., pág. 19. Más recientemente, la vigencia de esta doctrina fue reconocida por el Secretario de Justicia en Memorando de 5 de julio de 1990 dirigido a la Comisión de lo Jurídico de lo Civil de la Cámara de Representantes sobre el proyecto que luego se convirtió en la Ley Núm. 17, *supra.*

Es UNÁNIME la posición de que la cláusula de continuidad forma parte integrante del *término* del cargo y que, al activarse, no existe propiamente una vacante. En consecuencia, dentro del espíritu e intención del Art. V, Sec. 8 de la Constitución, *supra*, quedó consagrada como parte del término de los jueces y, por ende, no es susceptible de ser menoscabada o eliminada estatutariamente.

Es obvio, pues, que la presente apelación no se ha tornado académica por la Ley Núm. 17, *supra*. Dicho estatuto, cuanto menos, es inaplicable a los jueces nombrados y confirmados con anterioridad a su vigencia, cuyos nombramientos estaban cubiertos y protegidos *por razón de la cláusula de continuidad*.

Y, más importante aún, la misma visión y postura del Honorable Gobernador Rafael Hernández Colón, compartida por el Senado de Puerto Rico, según fue avalada en nuestra doctrina jurisprudencial a los efectos de que dicha cláusula forma parte integrante del término judicial a tono con el mandato del Art. V, Sec. 8 de nuestra Constitución, *supra* —dispositivo de que los términos de los jueces a ser fijados por ley "no podrán ser de menor duración que la prescrita para los jueces de igual o equivalente categoría"— choca con la Ley Núm. 17, *supra*. Ello es así, pues todos los antecedentes e indicadores demuestran que la cláusula de continuidad forma parte del término de los jueces, y de ese modo quedó cristalizada en nuestra Constitución. Lo expuesto, más allá de sus consecuencias prácticas,(1) pone de

---

(1) Así, tenemos el absurdo que surge al aplicarse la ley a jueces cuyos nombramientos vencieron con anterioridad a su vigencia. Veamos.

El Art. 2 de la Ley Núm. 17 de 21 de julio de 1990 (4 L.P.R.A. sec. 152), dispone que "[c]uando un juez . . . fuese renominado y confirmado, el término del nuevo nombramiento *comenzará a contar desde la fecha en que venció el término anterior*". (Énfasis suplido.) Ante este mandato, la única opción es restarle a su nuevo término el tiempo transcurrido desde que venció su nombramiento anterior.

Aplicada esta solución, nos enfrentamos con situaciones tales como la del Juez Municipal, Hon. Prudencio Collazo Padín —cuyo término expiró el *4 de diciembre de 1983*— y su renominación tendrá sólo un valor nominal o documental, a saber el correspondiente al pergamino que se le extendió. Y es que el término de un juez municipal de cinco (5) años implicará que *su renominación "expiró" el pasado 3 de diciembre de 1988*. ¿Qué hacerse con este patético caso? ¿Extenderle dos (2) renominaciones consecutivas para cubrir el déficit o limitarnos a honrar la labor de este funcionario judicial mediante una renominación sin valor práctico alguno?

En similar situación se encontrarán numerosos miembros de la Judicatura de aplicarse esta disposición retroactiva: la confiscación del tiempo transcurrido desde que expiraron sus anteriores respectivos términos. Entre otros, encontramos a los Jueces *Superiores*, Hons. Ronaldo Rodríguez Ossorio (12 de julio de 1990) e Ygrí Rivera de Martínez (13 de septiembre de 1990); a los Jueces de *Distrito*, Hons. Francisco Gandarilla Guerra (15 de abril de 1990), Otto Bauzá Rolón (15 de abril de 1990), Miguel Negrón Weber (15 de abril de 1990), Samuel Mártir Santiago (19 de octubre de 1985), Víctor Jiménez Balado (13 de junio de 1987), Carlos M. Delgado Villegas (5 de septiembre de 1987), José L. Miranda De Hostos (29 de abril de 1990) y Luis G. Saavedra Serrano (13 de junio de 1990), y los Jueces *Municipales*, Hons. Edwin Ruiz González (4 de enero de 1989), Misael

manifiesto que la Ley Núm. 17, *supra* —aunque limita a un máximo de noventa (90) días esa cláusula— no convierte el *mandamus* en académico.[2] Repetimos, la cláusula de continuidad forma parte del término de todo cargo judicial.

## V

Aclarado que la Ley Núm. 17, *supra*, no afecta la presente apelación, atendamos sus méritos.

Se recordará que en su sentencia el tribunal de instancia resolvió que el Honorable Gobernador Rafael Hernández Colón, en abono de la independencia judicial, estaba obligado a "descargar su poder de nombramiento dentro de un término relativamente corto". Escrito de apelación, Apéndice, pág. 36. A esos efectos expuso: "Estimamos que el mismo debe ser ciento veinte (120) días a partir de la fecha en que vence el nombramiento. Consideramos que dicho término de ciento veinte días es justo y razonable y no interfiere con las prerrogativas constitucionales del Gobernador, ni del Senado, ni de los jueces y elimina la incertidumbre que la actual práctica engendra. Pero puede ocurrir que el término que aquí fijamos de ciento veinte días, venza cuando la Legislatura esté en receso. *En ese caso, el Gobernador tendrá hasta los primeros cinco días de la próxima sesión ordinaria* o extraordinaria de la Legislatura para enviar los nombramientos." (Énfasis suplido.) Íd.

---

Ramos Torres (21 de junio de 1990), Aníbal Nieves Colón (21 de junio de 1990), María E. Feliciano Fuentes (24 de junio de 1990), Rafael A. Flores Díaz (21 de junio de 1990), Eiton F. Arroyo Muñiz (21 de junio de 1990), Ana L. Blanch Oyola (24 junio de 1990), Rubén Torres Dávila (21 de junio de 1990), Lydia E. Couvertier Martínez (24 de junio de 1990), Carmen O. Martínez Almodóvar (24 de junio de 1990), Gloria I. Ramírez Soto (24 de junio de 1990) y Reinaldo Franqui Carlo (24 de junio de 1990).

(2) No abordamos ahora el problema de si a través de esta legislación puede válidamente reconocérseles al Primer Ejecutivo y al Senado no sólo crear automáticamente, sino mantener vacantes judiciales por tiempo indefinido mediante inacción, en detrimento del mandato constitucional de "eficiencia en la organización y funcionamiento de la rama judicial". 1 Diario de Sesiones de la Convención Constituyente 452 (1951). Tampoco enjuiciaremos si ello atenta contra las necesidades de recursos humanos a nivel de la Judicatura, según certificado a través del trámite previsto en las Secs. 11 y 17 de la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico, 4 L.P.R.A. secs. 91 y 152.

Ciertamente, coincidimos con el foro de origen en que "[s]i el Honorable Gobernador tarda uno, dos, tres u ocho años en enviar al Senado un nombramiento de juez, no tan s[ó]lo *afecta a dicho juez* sino que afecta además *a la independencia judicial y despoja a la Rama Legislativa del poder constitucional de consejo y consentimiento*". Escrito de Apelación, Apéndice, pág. 15. Los argumentos esgrimidos por el Procurador General no logran superar la corrección y razonabilidad de esta conclusión.

Ahora bien, ¿tiene algún límite de tiempo el Gobernador para remitir al Senado los nombramientos judiciales? La interrogante no aparece contestada de manera expresa en la Constitución. Sin embargo, el debate de la Asamblea Constituyente en torno a la facultad ejecutiva de hacer nombramientos de receso, frente al Senado, arroja cierta luz.

El Art. IV, Sec. 4 de la Constitución del Estado Libre Asociado, Tomo 1, ed. 1982, pág. 349, dispone:

> Nombrar, en la forma que se disponga por esta Constitución o por ley, a todos los funcionarios para cuyo nombramiento esté facultado. El Gobernador podrá hacer nombramientos cuando la Asamblea Legislativa no esté en *sesión*. Todo nombramiento que requiera el consejo y consentimiento del Senado o de ambas cámaras quedará sin efecto *al levantarse la siguiente sesión ordinaria.* (Énfasis suplido.)

Este texto, en lo pertinente, originó una extensa discusión.(3) De su análisis inteligente se desprende que la Asamblea Constituyente: (1) relevó al Gobernador de tener que remitir al Senado,

---

(3) La inició el licenciado Fonfrías, cuando sugirió el lenguaje enmendatorio siguiente:

"'Todo nombramiento, que requiera la aprobación del Senado, deberá ser enviado por el Gobernador a dicho cuerpo legislativo en la *primera sesión ordinaria o extraordinaria de dicho Senado, celebrada inmediatamente después de efectuado el nombramiento*'.

"La explicación es . . .

"Sr. PRESIDENTE: Un momento. Antes de la explicación. ¿Quién secunda?

"UN DELEGADO: Secundo.

"Sr. PRESIDENTE: Debidamente secundada.

"Sr. FONFRIAS: La explicación es obvia. *No hay, en el proyecto sustituto del poder ejecutivo, indicación alguna de que los nombramientos sean enviados al Senado por el Gobernador.* Lo único que se menciona es el hecho de que el Senado habrá de indicar . . . 'todo nombramiento hecho por el Gobernador puede ser desaprobado o no por el Senado,' y se determina en las disposiciones contenidas desde la línea quinta a la novena lo

672

en sesiones *extraordinarias*, los nombramientos de receso pre-

pertinente a dichos nombramientos, *pero no hay una indicación mandatoria para que el [jefe] ejecutivo envíe al Senado los nombramientos.*

"Pudiera ser que el [jefe] ejecutivo hiciera un nombramiento y que en ese momento no lo enviara al Senado en la *primera sesión ordinaria y extraordinaria,* y que ese nombramiento hecho resultara que fuera de un individuo que no llenara a capacidad, con inteligencia, con honradez, con probidad, el puesto para el cual fue nombrado, y en esta forma quedaría lesionado el poder legislativo, que no tiene la facultad para rechazar o endosar debidamente ese nombramiento. En esta forma, con la enmienda nuestra, *se ordena al [jefe] ejecutivo que envíe al Senado todo nombramiento que haga, que sea de nombramiento del Senado.* Y además se le dice *en qué momento* debe remitir ese nombramiento al alto cuerpo legislativo, que es el Senado.

"Sr. GELPI: Señor Presidente . . .

"Sr. PRESIDENTE: ¿En contra?

"Sr. GELPI: Que se lea la enmienda.

"Sr. PRESIDENTE: 'Todo nombramiento que requiera la aprobación del Senado deberá ser enviado por el Gobernador a dicho cuerpo legislativo en la *primera sesión ordinaria o extraordinaria de dicho Senado efectuada inmediatamente después de efectuado el nombramiento.'*

"Sr. FONFRIAS: 'El referido nombramiento'.

"Sr. SECRETARIO: 'El referido nombramiento.'

"Sr. FONFRIAS: 'El referido nombramiento.'

"Sr. GELPI: ¿La idea es que se remita por el Gobernador al Senado *el primer día de la primera sesión ordinaria o extraordinaria? El primer día, que no dentro de la sesión, sino el primer día de la sesión.* Porque lo que sucede actualmente. . . Si me permiten argumentar la enmienda. . .

"Sr. FONFRIAS: No acepto la enmienda.

. . . . . . . .

"Sr. SECRETARIO: La enmienda a la enmienda es para que diga que 'todo nombramiento que requiere la aprobación del Senado, deberá ser enviado por el gobernador dentro *del primer día de la primera sesión'.*

"Sr. GELPI: Y añado ahora, 'dentro de la primera oportunidad', señor Presidente, porque lo que se quiere con esto remediar por el señor Fonfrías es lo siguiente: *que no se queden los nombramientos estancados o 'congelados' como se dice hoy, en la oficina del gobernador, hasta el último día de sesión, sino que se envíen en los primeros días, para que los señores puedan estudiar la lista de candidatos e investigar sus condiciones y ver si merece o no merece la conformidad o aprobación del Senado.*

"Sr. GOITIA: Señor Presidente, una pregunta . . .

"Sr. PRESIDENTE: ¿Una pregunta? La pregunta es al señor Gelpí, autor de la enmienda a la enmienda.

"Sr. GOITIA: Sí, señor. Señor Gelpí, ¿qué ocurriría . . . qué ocurriría si en el primer día de sesión de la Asamblea Legislativa estuviese enfermo el señor Gobernador?

"Sr. GELPI: Pues habrá una persona que lo sustituya, y por eso dije, *'en la primera sesión o en la primera oportunidad.'*

"Sr. DAVILA MONSANTO: Que se vote.

"Sr. PRESIDENTE: A la votación de la enmienda a la enmienda. Los que estén conformes . . . —tengo entendido que hay una discusión— levantarán la mano.

"Sr. SECRETARIO: Seis, señor Presidente.

"Sr. PRESIDENTE: *Derrotada.* Adelante con la argumentación de la enmienda del señor Fonfrías.

"Sr. DAVILA MONSANTO: Una pregunta al señor Fonfrías . . .

"Sr. PRESIDENTE: Una pregunta al señor Fonfrías . . .

"Sr. DAVILA MONSANTO: ¿Dónde sitúa el señor delegado Fonfrías su enmienda? ¿En qué sitio del papel?

"Sr. FONFRIAS: Pues, yo sitúo la enmienda en la página 2, línea 5ta., después de la palabra 'facultado'. Adicionar ahí, inmediatamente después de 'facultado' la enmienda. Entonces quedaría el resto del párrafo igual, como está.

"Sr. DAVILA MONSANTO: ¿Entonces no elimina . . .?

"Sr. FONFRIAS: No, no elimino nada. Quedaría el resto del párrafo igual que como está. Sencillamente adicionar la enmienda, después de 'facultado' . . . entonces comenzar la enmienda ahí.

"Sr. DAVILA MONSANTO: ¿Me puede creer que me ha convencido el señor Fonfrías?

"Sr. VALENTIN VIZCARRONDO: Que se lea, señor Presidente.

"Sr. PRESIDENTE: Se solicita por un delegado que se vuelva a leer la enmienda del señor Fonfrías.

"Sr. SECRETARIO: 'Todo nombramiento que requiera la aprobación del Senado deberá ser enviado por el Gobernador a dicho cuerpo legislativo en la primera sesión ordinaria o extraordinaria, de dicho . . .'

"Sr. FONFRIAS: ¿Dicho? 'del Senado'.

"Sr. SECRETARIO: '. . . del Senado, efectuada inmediatamente después del referido nombramiento.'

"Sr. GELPI: Va una coma. ¿Va una coma?

"Sr. SECRETARIO: ¿Dónde?

"Sr. FONFRIAS: Después de 'nombramiento', e inmediatamente después de 'y todo nombramiento', y sigue el párrafo que comienza en la línea 5ta., en la página dos. 'Y todo nombramiento que requiera la aprobación', etc.

"Sr. PRESIDENTE: ¿Estamos listos para votar la enmienda?

"Sr. PRESIDENTE: Señor Quiñones . . .

"Sr. QUIÑONES: Estoy pidiendo al Secretario que transcriba la enmienda para que la Comisión de la Rama Ejecutiva la tenga delante y pueda por un momento determinar cuál va a ser su acción para ahorrar tiempo en cuanto a la aceptación o rechazo de la enmienda. Sugeriríamos, señor Presidente, para no perder tiempo que se pasara a cualquier otra enmienda que haya, y le pediríamos al señor Fonfrías que aceptara la posposición de la consideración de su enmienda hasta un poco más tarde.

"Sr. PARKHURST: Para una enmienda.

"Sr. PRESIDENTE: Señor Parkhurst.

"Sr. PARKHURST: Que diga '*toda sesión legislativa ordinaria o extraordinaria*'.

"Sr. GELPI: Secundo.

"Sr. PRESIDENTE: Debidamente secundada la enmienda a la enmienda.

"Sr. FONFRIAS: No la acepto.

"Sr. PRESIDENTE: No se acepta. Si no hay discusión se va a someter a discusión la enmienda a la enmienda. ¿Quiere un turno?

"Sr. PARKHURST: Señor Presidente y compañeros delegados: Si el . . . si *la sesión ordinaria del Senado tiene el derecho de confirmar los nombramientos que haga el Gobernador, también lo tienen las sesiones extraordinarias y no veo ningún motivo por el cual el Gobernador no deba someter sus nombramientos a sesiones extraordinarias, igual que a las sesiones ordinarias.* Es lo único.

"Sr. PRESIDENTE: Señor Fonfrías.

"Sr. FONFRIAS: Con esta enmienda, se hace más clara la disposición que aparece. Estamos . . .

"Sr. PRESIDENTE: (Interrumpiendo) Estamos considerando la enmienda a la enmienda. La Presidencia entiende que el compañero va a combatir la enmienda en sí.

674

"Sr. FONFRIAS: Vamos a combatir la enmienda a la enmienda sugerida por el señor Parkhurst. Nuestra oposición a la enmienda se manifiesta sencillamente en que aun cuando en nuestra enmienda no aparece 'sesiones extraordinarias', eso, en forma alguna, impedirá al [jefe] ejecutivo enviar al Senado, en alguna sesión extraordinaria, cualquier nombramiento que él hiciere, no importa *en cuál de esas sesiones extraordinarias fuere.*

*El cumplimiento específico es de que se haga en la sesión ordinaria, pero eso no impedirá que el [jefe] ejecutivo lo pudiera hacer en cualquier sesión extraordinaria.*

"Sr. QUIÑONES: Señor Presidente.

"Sr. PRESIDENTE: Para un turno de rectificación al señor Parkhurst.

"Sr. PARKHURST: Señor Presidente y compañeros, si no se establece en la constitución que los nombramientos sean enviados a las sesiones extraordinarias, entonces solamente se pueden tratar los asuntos para lo cual fue hecha la convocatoria, y si se enmienda la enmienda para que los nombramientos sean enviados a las sesiones extraordinarias, entonces el Gobernador, además de hacer su convocatoria para lo que se va a tratar, envía sin tenerlo que incluir, en la convocatoria, los nombramientos *que ha hecho durante el receso que ha habido antes de esa sesión extraordinaria.*

"Sr. QUIÑONES: Señor Presidente, salvo que el compañero Fonfrías vaya a rectificar, para pedir que se vote.

. . . . . . . . . .

"Sr. PRESIDENTE: Señor Delegado. El señor Iriarte tiene la palabra.

"Sr. IRIARTE: Señor Presidente y compañeros delegados, especialmente el compañero Fonfrías, autor de la enmienda. Yo quisiera saber qué razón existe para que los nombramientos que debe hacer el [jefe] ejecutivo con el consejo y consentimiento del Senado, probablemente de acuerdo con las leyes, no deban ser sometidos a la consideración del Senado para que los *apruebe o los rechace, sino en las sesiones ordinarias del Senado, sesiones ordinarias de la Asamblea Legislativa y no en las sesiones extraordinarias. ¿Qué razón hay para que estén estos nombramientos hechos por tanto tiempo pendientes de la aprobación del Senado?* No entiendo que haya razón alguna para que ése sea el propósito de la enmienda, y por eso me manifiesto en contra de esa enmienda en esa forma, porque creo que si hemos de obtener el consentimiento del Senado, y sin duda el Gobernador ha dado nombramientos después de haber consultado al Senado, *lo lógico es que se le sometan cuanto antes al Senado para que complete esos nombramientos, y queden ya esos funcionarios tranquilamente desempeñando sus cargos.*

"Sr. FONFRIAS: Con la venia del Señor Presidente. El compañero Iriarte, si oyó bien la enmienda sugerida por nosotros, se daría cuenta que *nuestra enmienda de adición* es sencillamente la que ha sido leída y que podemos repetir. 'Todo nombramiento que requiera la aprobación del Senado deberá ser enviado por el Gobernador a dicho cuerpo legislativo, en su primera sesión ordinaria que se efectúe, inmediatamente después del referido nombramiento.' Esta es nuestra enmienda por adición. Lo demás incluido en la sección no ha sido alterado por nuestra enmienda, señor Iriarte, en forma alguna. Lo procedente sería que el incidente, el compañero Iriarte, si procediera, lo debe levantar cuando se fuera a discutir el resto de ese párrafo. Pero nuestra enmienda es sencillamente una adición que en nada tendría que ver con el resto del párrafo que aparece en el proyecto sustituto.

"(En este momento es llamado a presidir y ocupa la presidencia el delegado señor Luis Alfredo Colón.)

"Sr. IRIARTE: Me estoy refiriendo a la enmienda del compañero Fonfrías. Lo que acaba de leer, el compañero, que es su enmienda, que es la que dispone, que *hasta la sesión ordinaria del Senado,* no se le sometan al Senado para su aprobación, o confirmación, *los nombramientos hechos por el Gobernador cuando no está el Senado en sesión. Por eso digo, ¿qué razón hay para dejar pendiente, a veces por un año, de sesión a sesión del Senado, ordinaria, que serán anualmente las sesiones, ¿qué razón haya para dejar durante un año* pendiente de confirmación un nombramiento? *Para mantener en rehenes*

vios; (2) el licenciado Iriarte expuso la preocupación de "mantener

*a un funcionario pendiente de la confirmación de su nombramiento.* ¿Qué razón hay para eso?

"Como no entiendo que hay razón y no se ha dado razón alguna para eso, me manifiesto en contra de esa enmienda.

"Sr. FONFRIAS: ¿Acaso el compañero Iriarte ha visto en algún momento de esta enmienda el que no se pueda por el [jefe] ejecutivo enviar al Senado en alguna sesión extraordinaria algún nombramiento para su confirmación? No, no impide y lo ve claro el compañero, el que en una sesión extraordinaria el [jefe] ejecutivo esté facultado para mandar, enviar al Senado algún nombramiento que hiciera. Ahora, fíjese bien el compañero Iriarte, que una sesión extraordinaria por disposiciones de la Carta Orgánica, tenía un término fijo de 15 días en su duración y que por la constitución habría de tener un término de 20 días, pero que además la práctica nos ha hecho conocer de sesiones extraordinarias de términos sumamente limitados, de horas. Si se impusiere en esta constitución el que el [jefe] ejecutivo viniere obligado a enviar al Senado, en la sesión extraordinaria, nombramientos para su confirmación, lo someteríamos a una situación tan difícil [como es de suponer], constreñida con la amplia libertad democrática que él debiera tener, porque una sesión extraordinaria pudiera durar tres, cuatro o cinco horas, o veinticuatro horas, como ha sido ya la historia repetida en que hemos sido actores en un caso como éste. Y lo que quisiéramos hacer, sencillamente, es que en una sesión ordinaria, cuando el [jefe] ejecutivo puede hacer un nombramiento para enviarlo al Senado, que tenga ante su consideración, amplitud, tiempo suficiente para ver, estudiar el candidato que fuera a ocupar un puesto; pero eso no impide, repetimos, si en una sesión extraordinaria si el [jefe] ejecutivo lo quisiere, dispusiere o quisiere, podría mandar algún nombramiento a una sesión extraordinaria para su confirmación. Ese es el razonamiento que pudiéramos adelantar al compañero Iriarte.

"Sr. IRIARTE: Con la venia del Presidente, para contestar al compañero Fonfrías. No ha contestado el compañero a mi objeción. No creo que deba haber en adelante sesiones extraordinarias legislativas que duren horas nada más. No debe haberlas, eso no es lo propio. Lo propio es que la [Asamblea] Legislativa se reúna lo menos posible en sesiones extraordinarias, y por el período que la ley permite, para considerar detenidamente todos los asuntos que deben ser sometidos a su consideración. Si estamos determinando ahora en la constitución, qué es lo que deberá considerar en sus sesiones extraordinarias el Senado de Puerto Rico, ¿por qué no someterle un nombramiento que ha debido ser hecho con el conocimiento del Senado, o sea, de la representación senatorial en el distrito a que corresponde el nombramiento? Si ha sido hecho de acuerdo con el consejo y consentimiento del Senado, oyendo a los que se debe oír, para hacer los nombramientos, no veo por qué habrá que estudiar después cuando esté reunido el Senado y el Comité de Nombramientos esté considerando los nombramientos que hayan sido sometidos por el Gobernador, [por qué había que] estar entonces considerando ilos nombramientos que ha hecho el Gobernador, cuando se debe saber de memoria cuáles son los nombramientos y cuáles son las cualificaciones y las objeciones que hay contra los candidatos que hayan podido ser nombrados y que estén pendientes de sus nombramientos.

*"Es muy mala la práctica de dejar pendiente esos nombramientos por un período indefinido de una sesión ordinaria a otra del Senado, porque puede ser grandemente molesto para los candidatos.* Es muy preferible que se reúna el Senado en sesión extraordinaira y se le sometan todos los nombramientos hechos en receso del Senado por el Gobernador de Puerto Rico y que han debido serlo con el perfecto conocimiento de los oficiales correspondientes, senadores o representantes de los distritos en donde se han llenado esos nombramientos. Por eso digo que debe incluirse la enmienda esa, que ahorita se rechazó, de que fuera también en las sesiones extraordinarias donde se consideraban nombramientos, *y que no se dejen solamente de año a año, para hacer las confirmaciones de los empleados.*

"Sr. PRESIDENTE: Se va a someter a votación la enmienda del señor Fonfrías. Los que estén a favor de la enmienda, se servirán levantar la mano.

"Sr. SECRETARIO: Cuarenta y seis votos. ¿Su Señoría vota?

"Sr. PRESIDENTE: Sí.

"Sr. SECRETARIO: Cuarenta y siete votos, señor Presidente.

"Sr. PRESIDENTE: La enmienda ha sido aprobada por cuarenta y siete votos. Teniendo votos suficientes ha sido aprobada.

"Sr. CASILLAS: Señor Presidente.

"Sr. PRESIDENTE: Perdón, señor Delegado. El señor Arrillaga había pedido la palabra para hacer una enmienda a esta misma moción y se había pospuesto hasta que se votara esta enmienda. Tiene la palabra el señor Arrillaga.

"Sr. ARRILLAGA: Señor Presidente. En la misma sección en la línea 8, eliminar las palabras 'o extraordinaria' para que esté de acuerdo con que lo que [se] acaba de aprobar con la enmienda del compañero Fonfrías.

"Sr. ORTIZ: Secundo.

"Sr. PRESIDENTE: Secunda el señor Ortiz. Se va a someter a votación la enmienda del señor Arrillaga, los que estén conformes . . .

"Sr. QUIÑONES: Señor Presidente. Unicamente para decir que la enmienda es indispensable para aconsonantar el texto de la enmienda del compañero Fonfrías con el resto del artículo.

"Sr. PARKHURST: Señor Presidente.

"Sr. PRESIDENTE: El señor Parkhurst.

"Sr. PARKHURST: Solamente para dejar sentado nuestra oposición a esa eliminación, porque creemos que no sea para mantener un buen gobierno.

"Sr. VILLARES: Señor Presidente.

"Sr. PRESIDENTE: El Señor Villares.

"Sr. VILLARES: Señor Presidente y compañeros delegados: Yo me opongo a la enmienda propuesta por el compañero Arrillaga, porque precisamente la frase aquí, 'o extraordinaria', lo que hace es compeler, obligar, al gobernador, después de hecho un nombramiento de un funcionario que necesita la aprobación del Senado, si el gobernador desea que ese nombramiento o ese funcionario siga en sus funciones debe enviarlo a la consideración del Senado en una sesión extraordinaria, cuando el Senado esté reunido en sesión extraordinaria para impedir precisamente lo que quería que sucediera el compañero Parkhurst en su enmienda que fue derrotada y a la cual yo le voté a favor. Por eso es que me opongo a la elimina[ción] de 'o extraordinaria', a fin de que el gobernador venga obligado a enviar el nombramiento a la confirmación del Senado en una sesión extraordinaria, si es que desea que ese funcionario siga en sus funciones. Por eso pido a los compañeros que derroten la enmienda.

"Sr. ARRILLAGA: Señor Presidente.

"Sr. PRESIDENTE: El señor Arrillaga.

"Sr. ARRILLAGA: Señor Presidente. La enmienda del compañero Fonfrías *creaba la obligación en el gobernador de someter al Senado, en sesiones ordinarias únicamente, los nombramientos. Creaba la obligación, digo.* El gobernador, sin embargo, no está impedido, si así lo desea, de enviar nombramientos a la confirmación del Senado *en sesiones extraordinarias.* Pero, si no se quitan las palabras 'o extraordinarias' en la línea 8, página 2, el resultado sería que se derrotaría la moción del señor Fonfrías que acabamos de aprobar, porque entonces el *gobernador estaría también obligado a enviar los nombramientos a las sesiones extraordinarias.* Así como dijo el compañero Quiñones, para 'aconsonantar' la enmienda del compañero Fonfrías con el texto que sigue en esta sección, es absolutamente imprescindible eliminar las palabras 'o extraordinarias', a menos que no querramos reconsiderar la enmienda del señor Fonfrías y derrotarla; pero, aprobada la enmienda del señor Fonfrías, es absolutamente indispensable aprobar la eliminación de las palabras 'o extraordinarias' en la línea 8 que sigue.

en rehenes al funcionario pendiente de su confirmación"; (3) algunos delegados reconocieron lo molesto que resultaba para los candidatos quedar pendientes entre el período de una y otra sesión ordinaria; (4) se criticó la práctica de dejar "estancados o congelados" en la oficina del Gobernador los nombramientos, para luego enviarlos el último día de la sesión; (5) no se fijó un término *específico* para el Gobernador remitir los nombramientos al Senado; (6) quedó claramente plasmado el criterio de que el Gobernador los remitiera diligentemente, a la brevedad posible; (7) hubo consenso de que estaba *obligado* a hacerlo en la primera sesión ordinaria siguiente y dentro de un período razonable, acorde con las circunstancias particulares en ese momento, y (8) como término máximo, se visualizó el resultante entre una sesión ordinaria anual y la próxima (aproximadamente seis (6) meses, o sea, ciento ochenta (180) días).

Estas conclusiones en torno a los *nombramientos de receso* constituyen suficiente fuente para, *por analogía*, hacerlas extensivas a los nombramientos de funcionarios cuyos términos están protegidos con una cláusula de continuidad. Así lo hicimos en *Hernández Agosto v. López Nieves*, supra, pág. 621. No existe razón alguna para variar ese enfoque.

---

"Sr. QUIÑONES: Que se vote.

"Sr. VILLARES: Señor Presidente, para un turno de rectificación. Yo disiento del compañero Arrillaga. Lo que proponía la enmienda del compañero Fonfrías era —y [se demostró] al no admitir la enmienda a la enmienda de Parkhurst, de la palabra 'extraordinaria'— que el gobernador viniese obligado a enviar el nombramiento a la consideración del Senado en una sesión extraordinaria. No hay que 'aconsonantar' nada. Yo creo, y no soy perito en música, pero me parece a mí que según *no se aprobó la enmienda de Parkhurst* obligando al gobernador a enviar el nombramiento a una sesión extraordinaria del Senado, sin embargo, aquí con la palabra 'o extraordinaria', con la frase 'o extraordinaria', se llega al mismo propósito y al mismo fin. *Lo que pasa es que el gobernador no viene obligado a enviarlo —si no quiere, no lo envía— pero si no lo envía, entonces, el funcionario cesa.* Si el gobernador tiene interés en un funcionario que él ha nombrado, durante el receso que continúe en sus funciones, entonces, sin duda alguna, viene obligado por las circunstancias, no ya por la letra, viene obligado por la circunstancia de esta frase, a enviar el nombramiento a la consideración del Senado en esa sesión extraordinaria. Para proteger los derechos que aquí se han levantado por el compañero Parkhurst, es que yo creo que nosotros no debemos eliminar esta frase aquí, 'o extraordinaria'." (Énfasis suplido.) 3 Diario de Sesiones de la Convención Constituyente 1764–1856 (1952).

## VI

Con estos antecedentes en mente, ¿debe este Tribunal establecer o abstenerse de especificar determinado término? El ilustrado foro de instancia, ante la gravedad de la crisis creada por la inacción ejecutiva, lo creyó necesario y lo fijó en ciento veinte (120) días. Por otro lado, hemos visto que del historial legislativo y del texto de la Ley Núm. 17, *supra*, surge que noventa (90) días fueron considerados por la Legislatura y el actual Primer Ejecutivo como un término razonablemente suficiente para evaluar los candidatos.

Ciertamente, la decisión del foro de instancia mediante la cual impuso al Gobernador la obligación de enviar al Senado, para consejo y consentimiento, las designaciones de jueces sujetos a la cláusula de continuidad está en armonía con el enfoque y espíritu que prevaleció en la Asamblea Constituyente. Sin embargo, el término de ciento veinte (120) días es más corto que el resultante del modelo que prevalecía entonces de una sola sesión ordinaria anual. Entre una sesión y otra, transcurrían aproximadamente seis (6) meses.

Claro está, hoy día ese esquema y, por ende, la obligación ejecutiva, han cambiado en virtud de la nueva legislación que estableció dos (2) sesiones ordinarias anuales. Si la intención de la Asamblea Constituyente fue que el Gobernador actuara diligentemente —a más tardar, en ocasión de celebrarse la sesión ordinaria— con mayor razón debe ahora hacerlo en la primera oportunidad que surja al reunirse el Senado en cualquiera de sus dos (2) sesiones ordinarias. De ese modo no se priva a ese alto cuerpo del ejercicio efectivo y legítimo de su facultad de consejo y consentimiento.

Sin embargo, el propio legajo de la Constituyente revela, según antes apuntado, que se eximió al Primer Ejecutivo de tener que remitir al Senado los nombramientos de receso al convocar a sesiones extraordinarias. En este sentido erró el ilustrado foro de instancia y su decisión debe ser también modificada.

## VII

*Recapitulando.* El Gobernador, como poder nominador con sujeción a los requisitos del cargo judicial, tiene discreción para escoger determinado candidato. Aun así, su prerrogativa nominadora no es irrestricta. No puede vulnerar la facultad de confirmación del Senado al demorar su remisión.

La verdadera esencia de un sistema constitucional es la limitación en el ejercicio de poderes. La cláusula de continuidad quedó cristalizada en la Constitución como una extensión legítima del término de los cargos judiciales. Legislativamente no puede ser menoscabada ni eliminada. La Ley Núm. 17, *supra*, no torna académica esta apelación.

Mantener *ad infinitum* a los jueces bajo la cláusula de continuidad atenta contra el espíritu de la Constitución y tiende a socavar el balance de poderes e independencia judicial. LA OBLIGACIÓN DEL GOBERNADOR DE DESCARGAR DILIGENTEMENTE SU PODER DE NOMBRAMIENTO DE LOS JUECES Y DE REMITIR PRONTAMENTE AL SENADO SUS RENOMINACIONES O SUSTITUTOS SURGE EN OCASIÓN DE CELEBRARSE CUALESQUIERA SESIONES ORDINARIAS.

Con estas aclaraciones y modificaciones, confirmaríamos la sentencia del Tribunal Superior, Sala de San Juan.

—O—

Opinión disidente emitida por el Juez Asociado Señor Negrón García.

San Juan, Puerto Rico, a 16 de enero de 1991.

"No hay libertad si el poder de juzgar no está bien deslindado del poder legislativo y del poder ejecutivo." Montesquieu, *El Espíritu de las Leyes*, Buenos Aires, Ed. Libertad, 1944, pág. 150.

## I

Hace cinco (5) meses, en nuestro amordazado voto preliminar de 10 de septiembre de 1990, *in fine* dijimos:

El Gobernador, como poder nominador con sujeción a los requisitos del cargo judicial, tiene discreción para escoger determinado candidato. Aun así, su prerrogativa nominadora no es irrestricta. No puede vulnerar la facultad de confirmación del Senado al demorar su remisión.

La verdadera esencia de un sistema constitucional es la limitación en el ejercicio de poderes. La cláusula de continuidad quedó cristalizada en la Constitución como una extensión legítima del término de los cargos judiciales. Legislativamente no puede ser menoscabada ni eliminada. La Ley Núm. 17, *supra*, no torna académica esta apelación.

Mantener *ad infinitum* a los jueces bajo la cláusula de continuidad atenta contra el espíritu de la Constitución y tiende a socavar el balance de poderes e independencia judicial. LA OBLIGACIÓN DEL GOBERNADOR DE DESCARGAR DILIGENTEMENTE SU PODER DE NOMBRAMIENTO DE LOS JUECES Y DE REMITIR PRONTAMENTE AL SENADO SUS RENOMINACIONES O SUSTITUTOS SURGE EN OCASIÓN DE CELEBRARSE CUALESQUIERA SESIONES ORDINARIAS.

Con estas aclaraciones y modificaciones, confirmaríamos la sentencia del Tribunal Superior, Sala de San Juan. (Énfasis en el original.) Voto preliminar, págs. 678–679.

Hoy, contra toda lógica, sentido común y doctrina constitucional, vemos con angustia cómo la mayoría del Tribunal asesta irremediablemente un golpe mortal al principio de independencia judicial consagrado en nuestra Constitución. Al así decidir, caen en la flagrante contradicción de, por un lado, sostener que la Ley Núm. 17 de 21 de julio de 1990 (4 L.P.R.A. secs. 92, 152(c) y 211) no es aplicable a los jueces originalmente nombrados y protegidos por la cláusula de continuidad (*holding over clause*) para, por otro lado, luego *desnaturalizar* su espíritu dejándolos totalmente desamparados al resolver que éstos cesan en sus cargos al final de la sesión legislativa si no son renominados o confirmados. ¿En qué quedamos? ¿Se aplica o no retroactivamente la Ley Núm. 17, *supra*?

Mediante esa avenida decisoria, inexplicablemente la mayoría ignora y revoca toda la doctrina sobre la cláusula de continuidad establecida desde *González v. Corte*, 62 D.P.R. 161 (1943); *Acosta v. Corte*, 63 D.P.R. 651 (1944); *Fernández v. Corte*, 71 D.P.R. 161

(1950); *López v. Tribunal Superior*, 79 D.P.R. 20 (1956); *J.R.T. v. Milares Realty, Inc.*, 90 D.P.R. 844 (1964), hasta *Betancourt v. Gobernador*, 119 D.P.R. 435 (1987).

Específicamente, en *Acosta v. Corte*, supra, pág. 656, reiteramos a *González v. Corte*, supra, en lo referente a que es "evidente que el estatuto tiene dos propósitos: (1) retener en todo momento en el cargo a una persona que ha sido nombrada con el consejo y consentimiento del Senado, incluyendo el período después de que su término ha expirado, hasta que el Senado pueda reunirse y concurrir con el Gobernador en volverlo a nombrar o elegir su sucesor; (2) evitar vacantes que la ley aborrece, toda vez que entorpecen la continuación de la administración de los asuntos públicos".

También explicamos allí con mayor precisión el alcance jurídico, sabiduría, protección y dinámica de una cláusula de continuidad:

> La intención legislativa, claramente expresada en la ley creadora del cargo de fiscal de Bayamón, es que la persona nombrada por el Gobernador con el consejo y consentimiento del Senado, tendrá el derecho y el deber de ocupar dicho cargo por un período de cuatro años; y no queriendo el legislador que el puesto quede vacante al expirar los cuatro años, dispuso que el incumbente deberá *continuar* en el puesto *hasta que su sucesor sea nombrado. Y ese sucesor sólo puede ser nombrado por el Gobernador con el consejo y consentimiento del Senado.*
>
> El Senado, en el desempeño de su función ejecutiva de confirmar o desaprobar los nombramientos propuestos por el Gobernador, no está facultado ni para acortar ni para prorrogar el término legal de un cargo determinado. Lo único que puede hacer el Senado cuando el Gobernador le somete un nombramiento, ya sea éste a favor del mismo funcionario que lo ocupa en calidad de *holding over* o de un nuevo candidato, es otorgar o negar su consentimiento. La negativa del Senado en el presente caso sólo puede ser interpretada como una expresión de su deseo de que José Julián Acosta no ocupe el cargo por un nuevo término de cuatro años. Esa negativa del Senado no puede tener el efecto legal de acortar o cancelar el término del incumbente, pues ello equivaldría a reconocer al Senado la facultad legislativa de fijar o alterar los términos legales de los cargos públicos, facultad otorgada por la Ley Orgánica a la Asam-

blea Legislativa de Puerto Rico y no a una sola de sus dos cámaras. (Énfasis suplido.) *Acosta v. Corte*, supra, págs. 658–659.

La cuestión es tan trillada que en *Betancourt v. Gobernador*, supra, ratificamos la doctrina mediante *sentencia*. El Juez Asociado Señor Alonso Alonso, en opinión concurrente, *in extenso* suscribió esa posición. Sin ambivalencias sentenció que una ley contentiva de una cláusula de continuidad "requiere que el sustituto sea nombrado con el consejo y consentimiento del Senado". Íd., pág. 437.

## II

De inmediato unas aclaraciones. Para tratar de superar los fundamentos expuestos en nuestro amordazado *voto preliminar*, LA MAYORÍA DISTORSIONA TOTALMENTE LA CONTROVERSIA Y LA APRISIONA EN UN RAZONAMIENTO ENDEBLE Y CIRCULAR. Nos dice que este caso "plantea por primera vez ante este Tribunal si la cláusula de continuidad debe tener el efecto de mantener en sus puestos indefinida o eternamente a jueces cuyos términos han vencido. Esto es, si esta expectativa de continuidad debe tener límite . . .". Opinión mayoritaria, pág. 648. No es correcta esa afirmación. Confunde y diluye así *los efectos del incumplimiento del deber constitucional del Honorable Gobernador Rafael Hernández Colón*.

LA VERDADERA CONTROVERSIA ES SI EL HONORABLE GOBERNADOR RAFAEL HERNÁNDEZ COLÓN VIENE OBLIGADO CONSTITUCIONALMENTE A ENVIAR AL SENADO, EN UN *TÉRMINO RAZONABLE*, LA RENOMINACIÓN O SUSTITUCIÓN PARA CUBRIR LOS CARGOS DE AQUELLOS JUECES CUYOS TÉRMINOS HAN EXPIRADO. La mayoría trastoca las coordenadas decisorias y reconoce al Honorable Gobernador Rafael Hernández Colón una condición de *legibus solutus*, esto es, una persona todopoderosa que se sitúa y está sobre la Constitución y la Ley. ES INCREÍBLE. La facultad del Gobernador de nombrar no es absoluta; sólo puede ejercerla "en la forma que se disponga

por esta Constitución o por ley". Art. IV, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 349.

Pero hay más. La opinión mayoritaria se apuntala en una falacia. Por su propia naturaleza, la esencia de una cláusula de continuidad es la indefinición del término de duración. Si el Primer Ejecutivo, como poder nominador, diligentemente somete al Senado el nombramiento de un sustituto y éste prontamente lo confirma, la eficacia de la cláusula de continuidad habrá sido corta o ninguna. Por el contrario, si el Ejecutivo no actúa, la vigencia de dicha cláusula se extenderá por el tiempo que subsista esa omisión. ES CLARO, PUES, QUE NO ES DICHA CLÁUSULA, SINO LA CONDUCTA DEL PRIMER EJECUTIVO AL DEJAR DE ACTUAR DILIGENTEMENTE, LO QUE HA CAUSADO LA GRAVE SITUACIÓN SOBRE LOS MIEMBROS DE LA JUDICATURA EN LOS ÚLTIMOS AÑOS Y QUE DIO GÉNESIS A ESTE *MANDAMUS*. La mayoría no toca ni pone el dedo sobre esa llaga, esto es, sobre el "[d]año o infortunio que causa pena, dolor y pesadumbre". *Diccionario general ilustrado de la lengua española*, 3ra ed., Barcelona, Ed. Bibliograf, 1973, pág. 960.

Por esta razón, carente de argumentos persuasivos, la mayoría ha tenido que recurrir a un ejemplo hipotético y a una situación inexistente en el caso de autos. Nos referimos al *impasse* artificialmente creado en torno a la posibilidad de que el Gobernador reiteradamente se niegue a someter un nombramiento, o de éste remitirlo, el Senado se empeñe en rechazarlo. Fuera de esa ficción fáctica, es evidente que si el Primer Ejecutivo y el Senado descargan bien sus prerrogativas constitucionales, en su aplicación la cláusula de continuidad en nada afecta la doctrina de separación ni reduce sus poderes.

## III

Cualquier estudioso de los debates de la Asamblea Constituyente puede fácilmente advertir que la opinión mayoritaria se *desvía* de los siguientes sentimientos legítimos que inspiraron a los autores de nuestra Constitución:

*Primero*, una preocupación respecto a que era necesario garantizar que los jueces no estuviesen sometidos a las presiones político-partidistas. En sus distintas intervenciones, numerosos delegados reconocieron el apetito natural de los partidos y políticos de influenciar y controlar significativamente a los jueces. El sistema de nombramientos por término, mediante la cláusula de continuidad, trató de evitar que se convirtieran en rehenes del favor o temor político. 1 Diario de Sesiones de la Convención Constituyente 462–513, 673 (1952).

*Segundo*, ese sistema de nombramientos siguió, en palabras del Presidente de la Comisión de la Rama Judicial, Lcdo. Ernesto Ramos Antonini, "[l]a experiencia vivida por el pueblo de Puerto Rico con su tradición, la de que la selección de los jueces mediante el nombramiento [por] el Gobernador de Puerto Rico con la confirmación del Senado . . .". Diario de Sesiones, *supra*, pág. 497.

*Tercero*, ciertamente, los miembros de la Asamblea conocían y eran conscientes de las interpretaciones adoptadas por este Tribunal en *González v. Corte*, supra; *Acosta v. Corte*, supra, y *Fernández v. Corte*, supra, sobre los efectos jurídicos de la cláusula de continuidad. No existe un solo incidente o comentario en contrario. Esa jurisprudencia fue refrendada. No encontramos apoyo para la conclusión mayoritaria de que dicha cláusula —por la inacción de un Gobernador— tiene inicialmente unos efectos temporales limitados sobre los miembros de la Judicatura y, eventualmente, sus cesantías. Repetimos, los debates de la Asamblea Constituyente reflejan innumerables instancias en que los delegados eran conscientes del peligro natural de que los jueces estuviesen a merced de los poderes político-partidistas.

Resulta inconcebible, pues, la liviandad con que ahora el Tribunal trata el asunto de la independencia judicial. La lección es clara: una mayoría, dentro o fuera de este Foro, puede ser virtuosa y respetuosa de la Constitución o, por el contrario —como en el caso de autos— hacer una interpretación arbitraria que sólo favorece al Honorable Gobernador Rafael Hernández Colón. La decisión altera sustancialmente los papeles de los

poderes constitucionales. Desde este *estrado judicial condonan* la actuación del Honorable Gobernador Hernández Colón, a la par que *condenan* a los miembros de la Judicatura a un estado de indefensión.

Jamás nos imaginamos ser testigos de tan privilegiado trato y semejante interpretación. Y es que la opinión mayoritaria tiene la virtud de liberar al Honorable Gobernador Rafael Hernández Colón del mandato constitucional de remitir, dentro de un tiempo razonable, los nombramientos judiciales al Senado. Ese "relevo judicial" es extraño al ordenamiento jurídico *ante* y *post* constitucional. Aparte de que la mayoría no cita ninguna autoridad que directamente los apoye, el mejor argumento en contrario surge de la interrogante siguiente: ¿Quién, sino el propio Honorable Gobernador Rafael Hernández Colón ha sido el único causante de que la cláusula de continuidad haya operado más allá de un período de una sesión legislativa o por tiempo irrazonable?

Bajo el pretexto de lograr un balance constitucional en las prerrogativas del Primer Ejecutivo y del Senado, *la mayoría inmola a la Judicatura, creando vacantes donde no las hay*. Incomprensiblemente equipara a sus miembros con los otros funcionarios del Ejecutivo. Cae así en la superficialidad de reducir el problema a una simple ecuación de "interés propietario". Esa técnica descarta las diferencias significativas y obvias que existen, dimanantes del cargo judicial, y que fueron plasmadas en el debate de la Asamblea Constituyente *en abono, no de la persona del juez, sino de la independencia judicial*.

A corto y a largo plazo, la mayoría acomoda los intereses exclusivos del Honorable Gobernador Hernández Colón en menoscabo del poder de confirmar del Senado. La decisión tiene el efecto de sostener implícitamente que la cláusula de continuidad es inconstitucional. Es un absurdo: lo inconstitucional es la conducta del Honorable Gobernador Rafael Hernández Colón. Ha sido precisamente su inacción en actuar lo que ha privado al Senado de intervenir. De ese modo, la mayoría invierte los valores constitucionales tutelados. Acudiendo a la situación hipotética *extrema* —que el Gobernador no nombra o que el Senado no

confirma determinado juez— concluye que la operación indefinida de la cláusula de continuidad "socava" las funciones de ambos poderes. Sin embargo, ¿qué de la independencia judicial? ¿Es que el consenso se logra infringiendo un perjuicio directo a los miembros de la Judicatura? ¿Desaparecen entonces, por arte de magia, las diferencias entre el Ejecutivo y el Senado?

Resumiendo: la opinión mayoritaria adolece de ese serio defecto conceptual. De hecho, como no reconoce la obligación constitucional que tiene el Honorable Gobernador Rafael Hernández Colón de someter previamente al Senado si determinado juez debe o no permanecer en la Judicatura, se ha visto forzada a reescribir los efectos de la cláusula de continuidad. Olvida que fue el Honorable Gobernador Rafael Hernández Colón, como Primer Ejecutivo, quien inexcusablemente no cumplió con su deber constitucional, propició la crisis en la Rama Judicial y permitió que la cláusula de continuidad tuviera unas consecuencias temporales innecesarias en detrimento de las prerrogativas del Senado y de los jueces incumbentes. *Definitivamente soslaya la controversia central: su incumplimiento craso. De esa manera reduce a letra muerta la cláusula de continuidad que ampara a los jueces y, claro está, los deja a merced del crudo partidismo político.*

## IV

No podemos pasar por alto que el único fundamento en que se funda la mayoría para la nueva visión sobre la cláusula de continuidad es el "poder compartido" entre el Ejecutivo y el Senado, expuesto en *Hernández Agosto v. López Nieves*, supra. Sin embargo, igualar los efectos de la cláusula de continuidad judicial a la situación distinta de *interinato* sobrepasa nuestra imaginación. Frente a este tipo de razonamiento, nada más podemos aducir.

Esa interpretación no sólo subvierte el principio de independencia judicial, sino que trastoca todo el esquema constitucional. Regresamos al oscurantismo constitucional. Ante la misma, debe-

mos seriamente considerar si, después de esta decisión, no es mejor cerrar la Secretaría del Tribunal y dedicarnos a ser simples expectadores de las acciones inconstitucionales del Honorable Gobernador Rafael Hernández Colón. Nos explicamos.

El agravio continúa. Tomamos conocimiento judicial que *ayer*, 15 de enero de 1991, el Honorable Gobernador Rafael Hernández Colón renominó y sometió a la consideración del Senado el nombre de la Juez Superior, Hon. Igrí Rivera de Martínez, y el de los Jueces de Distrito, Hons. Carlos M. Delgado Villegas, Miguel A. Santiago Gómez y Samuel Mártir Santiago. También, que renominó a varios jueces municipales y sustituyó a otros.

No obstante, AL DÍA DE HOY NO HA ACTUADO en cuanto al Honorable Juez Superior Ronaldo Rodríguez Ossorio —cuyo término expiró el 13 de agosto de 1990— y sobre los Honorables Jueces de Distrito, Víctor Jiménez Balado —cuyo término expiró el 13 de junio de 1987— Ana D. Sánchez —cuyo término expiró el 22 de abril de 1990— y Rafael Hernández Torres, cuyo término expiró el 23 de septiembre de 1990. Tampoco ha tomado nuevamente acción en cuanto al Honorable Juez Municipal Prudencio Collazo Padín, cuyo término finalizó el 4 de diciembre de 1983 y a quien el año pasado el Senado dejó pendiente de considerar al finalizar la sesión.

No es de nuestra incumbencia si esos jueces deben o no ser renominados o sustituidos. Lo que sí es obvio, bajo los parámetros constitucionales y estatutarios correctos esbozados en nuestro voto preliminar del pasado 10 de septiembre de 1990 y en esta disidencia, *es que no existe excusa alguna para seguir consintiendo* la demora del Honorable Gobernador Rafael Hernández Colón. Y es que si a estos jueces los ampara la cláusula de continuidad —y no les aplica la Ley Núm. 17, *supra*— ¿cómo puede entonces la mayoría sostener que *automáticamente* cesarán en sus puestos al final de la presente Sesión Legislativa? Al no renominarlos u omitir someter sus sustitutos, ¿no continúa el Honorable Gobernador Rafael Hernández Colón inconstitucionalmente privando al Senado de sus prerrogativas?

Todo este drama es simplemente doloroso. *Es la primera vez, en época reciente, que un Gobernador, a ciencia y paciencia del Poder Judicial, se niega abierta, rotunda e inexcusablemente a cumplir con un mandato constitucional específico.* Nuestros esfuerzos han ido dirigidos a persuadir a la mayoría de que, como jueces, no podíamos tolerarlo. Han sido en vano. Removida, pues, la oligárquica mordaza judicial, evocamos el pensamiento del Juez William O. Douglas respecto a que "la luz solar continúa siendo el mejor antiséptico". Sólo nos resta, una vez más, dejar constancia de nuestra voz de protesta. Con pena denunciamos ante el país que se ha perdido toda noción de constitucionalismo y objetividad. *A los autores de la crucifixión y exequias de la independencia judicial paradójicamente se ha unido la mayoría del Tribunal Supremo. ELI, ELI, ¿LAMA SABACTANI?* (DIOS MÍO, DIOS MÍO, ¿POR QUÉ ME HAS ABANDONADO?

—O—

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

San Juan, Puerto Rico, a 5 de febrero de 1991.

El recurso de epígrafe es uno que, en sus efectos, ciertamente puede y debe ser calificado como *lamentable*. El mismo, *en primer lugar*, ha servido de base para que el Tribunal —al amparo del anonimato que ofrece el mecanismo procesal decisorio de la opinión *per curiam*— emita una de las opiniones más innecesarias, erróneas y violativas del debido proceso de ley que pueda mente jurídica alguna imaginarse.

La emisión de una decisión por este Tribunal que resulta en una injusticia *siempre* es dañina y trágica. La decisión mayoritaria emitida en el presente caso, sin embargo, aparenta ser más dolorosa por cuanto los perjudicados por la misma resultan ser los miembros de la Judicatura puertorriqueña a nivel de instancia. Lo verdaderamente sorprendente resulta ser el empeño desplegado para lograrlo. A esos efectos se incurre en un innecesario, craso y constitucionalmente prohibido acto de "legislación judicial" que

desemboca en una grave violación del "debido proceso de ley". *La justicia empieza por nuestra propia casa. Si se es injusto con los propios, ¿qué se puede esperar para con los demás?*

El recurso resulta ser lamentable, *en segundo lugar*, por cuanto el mismo ha servido de trasfondo para que esa misma mayoría,[1] en una palpable demostración del poder con que se puede actuar cuando se cuenta con una mayoría absoluta, haya crudamente coartado el derecho de expresión de uno de sus miembros, en específico, el del Honorable Juez Asociado de más antigüedad en el Tribunal: Antonio S. Negrón García.

## I

El correcto entendimiento de lo antes expresado hace necesario una breve exposición, y resumen, de los hechos relevantes que precedieron a la emisión de la opinión mayoritaria.

Hace poco más de año y medio, específicamente *el día 10 de mayo de 1989*, dos miembros minoritarios del Senado de Puerto Rico radicaron un recurso de *mandamus* contra el Honorable Gobernador del Estado Libre Asociado de Puerto Rico, Lcdo. Rafael Hernández Colón, ante el Tribunal Superior de Puerto Rico, Sala de San Juan. En el mismo, en lo pertinente, se alegó que la inacción del Gobernador al no renominar, o sustituir, a jueces del tribunal de primera instancia —cuyos términos de nombramiento habían vencido y que continuaban ejerciendo sus cargos bajo la "cláusula de continuidad" de la Ley de la Judicatura, Ley Núm. 11 de 24 de julio de 1952 (4 L.P.R.A. secs. 92 y 152)— violaba la facultad constitucional del Senado sobre "consejo y consentimiento" y, como resultado de ello, la doctrina de separación de poderes. Solicitaron del mencionado tribunal, en consecuencia, que le ordenara al Gobernador que procediera a

---

(1) En el voto preliminar que redactara el Juez Asociado Señor Negrón García el 10 de septiembre de 1990 —ponencia que una mayoría de los integrantes del Tribunal impidió que se publicara— el Juez Negrón García identifica al "Juez Presidente Señor Pons Núñez, los Jueces Asociados Señores Hernández Denton, Alonso Alonso y Andréu García" como los directamente responsables de que ello así sucediera.

renominar, o sustituir, a los jueces que así estaban ejerciendo su ministerio.

En la contestación que oportunamente radicara el señor Gobernador, su representación legal levantó las defensas siguientes: la ausencia de parte indispensable; improcedencia del recurso planteado debido a la discrecionalidad inherente a su facultad nominadora; que el asunto planteado constituía una cuestión política no justiciable, e incorrección de la aseveración a los efectos de la existencia de vacantes por razón de la operación de la "cláusula de continuidad" que cobija a los jueces de instancia.

El tribunal de instancia, luego de la ocurrencia de ciertos trámites que resulta innecesario mencionar, *dictó sentencia el día 2 de mayo de 1990*. En la misma dictaminó, en lo pertinente, que la aludida inacción del Gobernador efectivamente constituía "una práctica inconstitucional que priva al Senado de Puerto Rico de su poder constitucional de consejo y consentimiento . . .". Escrito de apelación, Apéndice, pág. 35. Como remedio para hacer efectivo su dictamen de inconstitucionalidad, el tribunal de instancia le impuso la obligación al Gobernador de enviar al Senado "dentro de los próximos ciento veinte días, nombramientos, bien sean los actuales incumbentes o sus sustitutos, para cubrir los cargos de jueces cuyos términos han expirado". Íd., pág. 36.

Inconforme, el señor Gobernador radicó ante este Tribunal *el 1ro de junio de 1990* el correspondiente recurso de apelación imputándole error al así decidir el foro de instancia. Estando pendiente el referido recurso de apelación ante este Tribunal, y sin que sobre el mismo se hubiera actuado, la Asamblea Legislativa aprobó, y el Gobernador endosó con su firma, *la Ley Núm. 17 de 21 de julio de 1990*. La referida Ley Núm. 17 eliminó o suprimió la "cláusula de continuidad" contenida en la Ley de la Judicatura mediante la aplicación de la cual los jueces del Tribunal de Primera Instancia a quienes se les ha vencido su término de nombramiento desempeñan sus cargos "hasta que su sucesor tome posesión de su cargo".

La citada Ley Núm. 17, por el contrario, establece que el juez "cesará en sus funciones a los noventa (90) días de vencerse [su]

término si no ha sido renominado o cuando su sucesor tome posesión de su cargo, lo que ocurra primero". 1990 Leyes de Puerto Rico 84. Por otro lado, la citada Ley Núm. 17 estipula que la misma es extensiva a *todos* los jueces del Tribunal de Primera Instancia, esto es, *inclusive* a los jueces que fueron nominados y confirmados *antes* de la fecha de su vigencia, cual es, el 19 de octubre de 1990.

En vista de la aprobación, con posterioridad a la emisión de la sentencia por el foro de instancia, de la referida Ley Núm. 17, mediante Resolución de fecha 3 de agosto de 1990 este Tribunal le concedió término "a las partes" para que se expresaran respecto a la *posible* academicidad del recurso de apelación radicado por el Gobernador. La parte demandante apelada compareció expresando que a su entender la Ley Núm. 17, *supra,* no hacía académico su reclamo, el cual había sido refrendado por el tribunal de instancia. Contrario parecer sostuvo el Procurador General de Puerto Rico, representante legal del Gobernador, en su comparecencia ante este Tribunal. Sostuvo dicho funcionario, en adición, que la Ley Núm. 17, *supra,* no adolece de problema constitucional alguno en su aplicación retroactiva a los jueces que fueron nominados y que juraron sus cargos con anterioridad a la fecha de vigencia de la misma.

Le dimos curso al recurso de apelación radicado.

## II

Independientemente del hecho que el presente caso se puede "dividir", con el propósito de realizar un mejor análisis jurídico del mismo, en *dos etapas* —esto es, la etapa *pre* aprobación de la Ley Núm. 17, *supra,*(2) y la etapa *posterior* a la vigencia de dicho estatuto— lo cierto es que *la controversia principal a resolver en el mismo siempre ha sido si la inacción del Gobernador al no*

---

(2) Esta primera etapa incluye *desde* la radicación del pleito ante el tribunal de instancia por los Senadores demandantes, la emisión de la sentencia por dicho foro judicial, *hasta* la radicación del recurso de apelación ante este Tribunal por parte del señor Gobernador.

*renominar, o sustituir, los jueces que estaban ejerciendo su función bajo la mencionada "cláusula de continuidad" viola, o no, la facultad constitucional del Senado sobre "consejo y consentimiento".* Existían, naturalmente, *otras controversias* a resolver, las cuales tenían relación directa con las defensas afirmativas levantadas por el Gobernador en la "contestación" que éste radicara respecto al recurso de *mandamus,* a saber: la falta de legitimación activa, o capacidad, de los Senadores demandantes para radicar el pleito; que el asunto planteado era uno político no justiciable; la ausencia de parte indispensable, etc.

La aprobación de la Ley Núm. 17, *supra,* trajo al pleito una *controversia adicional,* esto es, si la acción radicada por los Senadores demandantes —y, en consecuencia, el recurso de apelación pendiente ante este Foro— *se había convertido en académico;* ello en vista del hecho antes mencionado de que la citada Ley Núm. 17, *supra,* suprimía o eliminaba la "cláusula de continuidad" según la misma estaba concebida en la Ley de la Judicatura *y en vista de que, conforme los propios términos de dicha ley, la misma era aplicable inclusive a los jueces que habían tomado posesión de sus cargos con anterioridad a la vigencia de la referida Ley Núm. 17, cuales eran precisamente los jueces sobre los cuales versaba la acción de "mandamus" radicada.*

Una somera lectura de la opinión mayoritaria emitida demuestra que el Tribunal, aun cuando de distinta forma y manera, dispuso de todas y cada una de las controversias antes mencionadas.

La mayoría rechazó y descartó, de un plumazo, las defensas afirmativas levantadas por el Gobernador referentes a "la falta de legitimación activa de los Senadores recurridos —la ausencia de partes indispensables y que el asunto planteado no es justiciable . . .". Opinión mayoritaria, pág. 654.

Resulta curioso el hecho que al así decidir "sumariamente" estas controversias colaterales, el Tribunal —*aun cuando en una forma tímida e indirecta*— adjudicó, en forma favorable para los Senadores demandantes, la controversia principal planteada por

dichos legisladores, esto es, que la inacción del Gobernador respecto a los jueces *holding over* efectivamente menoscaba la facultad constitucional de "consejo y consentimiento" del Senado; controversia que había esbozado, y dejado sin resolver, al comienzo de la ponencia.[3]

La controversia sobre posible academicidad del recurso, producida la misma por la aprobación de la Ley Núm. 17, *supra,* fue enfrentada por el Tribunal en forma directa, y resuelta por éste de manera expresa. A esos efectos manifestó el Tribunal, a las págs. 647–648 de la opinión *per curiam* emitida, que:

A tono con lo antes dicho, *resulta inescapable la conclusión* al efecto de que la adopción de la mencionada ley [la Ley Núm. 17] *no* ha tornado académica la presente apelación, *ya que* dicho estatuto no pone fin a la controversia envuelta en este recurso *por razón de que la Ley Núm. 17 no puede tener efecto retroactivo a los jueces incumbentes que fueron nombrados bajo la vigencia de las cláusulas de continuidad.* (Énfasis suplido.)[4]

La solución y disposición de dicha controversia —la última que restaba por resolver— debió haber constituido el "punto final" de la actuación decisoria del Tribunal respecto al recurso ante su consideración. Desafortunadamente para nuestro ordenamiento jurídico y, en especial para los jueces del tribunal de primera instancia, ello no fue así.

---

[3] En la pág. 644 de la opinión *per curiam* emitida, el Tribunal se expresó de la manera siguiente:

"*De tener el Gobernador el deber* de enviar al Senado la nominación de los jueces cuyos términos han vencido o de sus sucesores, *la omisión de así hacerlo ciertamente menoscabaría las funciones constitucionales de los Senadores recurrentes.*

"*De existir, pues, este deber, el interés de los Senadores en la causa de acción ejercitada resulta evidente y cumple cabalmente con la doctrina de capacidad jurídica.*" (Énfasis suplido.)

Como expresáramos anteriormente, habiendo condicionado la existencia de dicho deber a si los Senadores demandantes tenían o no capacidad jurídica para radicar el pleito, al finalmente resolver que los demandantes efectivamente tienen esa capacidad, el Tribunal ciertamente resuelve que la inacción del Gobernador respecto a los nombramientos judiciales menoscaba la antes mencionada facultad constitucional del Senado de Puerto Rico.

[4] El "fundamento jurídico" para lo antes señalado, *conforme lo expresa la mayoría del Tribunal,* lo constituye el hecho de que la aplicación retroactiva de la Ley Núm. 17 de 21 de julio de 1990 (4 L.P.R.A. secs. 92, 152 y 211), viola el "interés propietario" de los jueces en controversia, "interés" garantizado por la Sec. 7 del Art. II de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1.

Olvidándose del principio básico de que nuestro derecho procesal es uno rogado, *Pueblo v. Prieto Maysonet*, 103 D.P.R. 102, 107 (1974), *Pueblo v. Casiano Vélez*, 105 D.P.R. 33, 36 (1976), y violando impunemente la sabia norma de autorestricción judicial a los efectos de que los tribunales no se anticiparán a decidir una cuestión de derecho constitucional antes de que sea necesario hacerlo, *Esso Standard Oil v. A.P.P.R.*, 95 D.P.R. 772 (1968), *el Tribunal se envuelve e incurre en uno de los actos más crudos de "legislación judicial" de que hayamos tenido conocimiento.*

Sin que ninguna de las partes tan siquiera lo hubiera planteado y sin que ello fuera necesario para la solución del recurso ante su consideración, la mayoría del Tribunal decreta que la "cláusula de continuidad" establecida en la Ley de la Judicatura, la cual contempla la posibilidad de que un juez se mantenga en su puesto por un período de tiempo indefinido, "atenta contra el equilibrio que intenta mantener la Constitución en lo que respecta al ejercicio de nombramiento compartido por la Rama Ejecutiva y la Legislativa" (opinión mayoritaria, pág. 650), razón por la cual ésta no puede prevalecer en nuestro ordenamiento jurídico.

Citando como "precedente" el caso de *Hernández Agosto v. López Nieves*, 114 D.P.R. 601 (1983) —los hechos del cual son total y completamente distinguibles de los del caso de epígrafe, razón por la cual dicha decisión no es aplicable—(5) *el Tribunal legisla y establece que,* una vez vencido el término para el cual los jueces incumbentes fueron nombrados, éstos podrán continuar actuando como tales "hasta que su sucesor tome posesión del cargo *pero nunca después de finalizada la próxima sesión legislativa siguiente a dicha expiración*". (Énfasis suplido.) Opinión *per curiam*, 652.

En otras palabras, a pesar de que el Tribunal resuelve que el término de noventa (90) días que establece la citada Ley Núm. 17 no puede ser aplicado retroactivamente a los jueces que juraron

---

(5) En el caso de *Hernández Agosto v. López Nieves*, 114 D.P.R. 601 (1983), se trataba de un *nombramiento interino* de la Rama Ejecutiva, al cual no le cobijaba una "cláusula de continuidad", y donde no está envuelto el concepto de independencia judicial.

su cargo antes de la vigencia de la referida ley —ello por razón de que, *según la mayoría*, dicha legislación afecta el "interés propietario" de los jueces garantizado por la Sec. 7 del Art. II de la Constitución, L.P.R.A., Tomo 1— *el Tribunal, a renglón seguido, establece, por fiat judicial, un término que igualmente afecta y perjudica a éstos: la duración de la próxima sesión ordinaria de la Legislatura.* Nos atrevemos a pronosticar que el acto de "legislación judicial" —en perjuicio de los "intereses" de los jueces de instancia— en que ha incurrido el Tribunal al así actuar será tristemente conocido como la *"Ley Número 18"*, aprobada por el Tribunal Supremo de Puerto Rico el día 16 de enero de 1991.

Resulta, cuando menos, curioso que la mayoría del Tribunal no se percate del mayúsculo error, y de la grave injusticia, que comete al así actuar; esto es, de la crasa violación en que incurre en relación con el "debido proceso de ley". *Llana y sencillamente emite un dictamen que coarta, perjudica y atenta contra los mejores intereses y derechos de los jueces incumbentes sin que éstos hayan tenido la oportunidad de expresarse y ser oídos en su defensa.* Nos explicamos.

Como expresáramos anteriormente, la *controversia principal* que planteaba el presente caso lo era si la inacción del Gobernador —relativa la misma a la renominación o sustitución de los jueces que ejercían sus funciones bajo la mencionada "cláusula de continuidad"— violaba o no la facultad constitucional del Senado sobre "consejo y consentimiento". No hay duda que siendo ello así, los jueces incumbentes, en la primera etapa de los procedimientos, *no* eran "parte indispensable" en dicho pleito por el fundamento de que, como este Tribunal expresara en *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407, 413 (1982), la:

> . . . razón de pedir en este caso el envío de las nominaciones de los funcionarios concernidos al Senado *nada requiere de éstos, y más aún, nada puede requerirles porque ellos no tienen incumbencia en el asunto.* Por tal razón, *la controversia puede dilucidarse en ausencia de dichos funcionarios* . . . . (Énfasis suplido.)

Es debido a lo anteriormente expresado que el foro de instancia *no* cometió error al rechazar la defensa afirmativa del Gobernador sobre "ausencia de parte indispensable". De este Tribunal *haberse limitado* a resolver las cuestiones que le fueron planteadas por las partes, su actuación al rechazar tal defensa de "parte indispensable", igualmente hubiera sido jurídicamente correcta.

*Pero, ¿qué sucede?* La mayoría del Tribunal se extralimita y en un acto *ultra vires* y de crasa "legislación judicial", y, en violación de la norma jurisprudencial sobre autorestricción judicial en cuestiones constitucionales, arremete *motu proprio* contra la "cláusula de continuidad" contenida en la Ley de la Judicatura, decretando que la misma —la cual cobija a los jueces incumbentes— es inconstitucional en tanto y en cuanto permite el ejercicio del cargo de juez en forma indefinida. No creemos que persona alguna, de manera seria y responsable, pueda sostener que dicha actuación no afecta de manera sustancial los "intereses y derechos" de los jueces incumbentes. Por el contrario, resulta inescapable la conclusión de que la decisión emitida por el Tribunal afecta gravemente sus "intereses y expectativas".

No debe haber la menor duda, en consecuencia, que el Tribunal venía en la obligación —*bajo el mandato de la cláusula constitucional sobre debido proceso de ley*— de darle audiencia a dichos jueces antes de así decidir. Su omisión de así hacerlo, desafortunadamente para nuestro sistema de justicia, constituye una actuación sumamente desafortunada y errónea; *actuación que el Tribunal debería de reconsiderar y dejar sin efecto.*

Hemos resuelto que la ausencia de parte indispensable es un asunto "de orden *tan relevante y vital* que [el mismo] puede presentarse en apelación por primera vez o *aun suscitarse por este Tribunal sua sponte*". (Énfasis suplido.) *Hernández Agosto v. López Nieves*, ante, pág. 603. Después de todo, el "prestigio, validez y fuerza moral intrínsecos de una decisión judicial no sólo dependen de sus razonamientos, *sino de darle oportunidad de*

*enfrentarla por quien viene obligado a acatarla"*. (Énfasis supli-
do.)(6)

*Ello constituye un postulado básico del "debido proceso de
ley"; esto es, quien puede resultar perjudicado por la decisión
judicial a emitirse tiene el derecho a ser oído.* Véase J.A. Cuevas
Segarra, *Práctica Procesal Puertorriqueña: Procedimiento Ci-
vil*, San Juan, Pubs. J.T.S., 1979, Vol. II, pág. 212.

## III

Un comentario final. El mismo respecto a la situación ocurrida
en relación con el Juez Asociado Señor Negrón García durante el
transcurso de la consideración del presente recurso de apelación;
incidente que dicho distinguido Juez califica como una "peculiar y
grave situación institucional", "equivalente [la misma] a una
'mordaza judicial'" en el voto preliminar, pág. 654, que sobre dicha
situación éste emitiera el pasado 10 de septiembre de 1990.

Dicha *lamentable* situación *nunca* debió de ocurrir. La ocu-
rrencia de la misma, sin embargo, ya la habíamos pronosticado en
la opinión disidente que emitiéramos en *In re Reglamento del
Tribunal Supremo*, 118 D.P.R. 279, 281 (1987). La misma no nos
sorprende. Al entonces disentir de la actuación de una mayoría de
los integrantes del Tribunal —limitando el período de tiempo en
que un Juez de este Tribunal podía emitir una ponencia en un caso
en el cual se había reservado ese derecho, práctica existente por
décadas en el Tribunal— expresamos, en lo pertinente, que:

> La determinación que hoy se ha tomado tiene, por lo antes
> expresado, el efecto perjudicial e indeseable *de coartar el derecho a
> expresarse* de los componentes de este Tribunal y afecta el desem-
> peño y descargo del deber y las responsabilidades que todos los
> miembros de esta Institución tenemos con el Pueblo de Puerto Rico.
> *Un tribunal colegiado nunca debe suprimir o limitar el derecho
> de expresión de sus integrantes. Tenemos la obligación como jueces
> de fomentar al máximo la observancia de ese derecho.* Debemos

---

(6) Véase opinión disidente del Juez Asociado Señor Negrón García en *Hernández
Agosto v. López Nieves*, 114 D.P.R. 601, 623 (1983).

siempre recordar que la posición minoritaria de hoy puede constituir la mayoritaria del mañana. (Énfasis suplido.) *In re Reglamento del Tribunal Supremo*, ante, pág. 285.

Lo sucedido en el presente caso, repetimos, es una muestra clara del ejercicio crudo del poder cuando se sabe que se cuenta con una mayoría numérica imposible de superar no obstante los titánicos y honestos esfuerzos a esos efectos de los miembros de una minoría. Resulta, cuando menos, lamentable y trágico que ello suceda en el más alto Tribunal de nuestro País, institución que se supone sea la "cuna" de la justicia que debe imperar en el mismo.